WALTER G. ANDREWS and LOUISE S. ANDREWS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Andrews v. Commissioner
Docket No. 2482-73.
United States Tax Court
T.C. Memo 1976-106; 1976 Tax Ct. Memo LEXIS 298; 35 T.C.M. (CCH) 459; T.C.M. (RIA) 760106; April 5, 1976, Filed *298 On July 29, 1966, petitioner received a 30 percent interest in Holiday Realty, Inc., in Exchange for his 30 percent interest in Holiday Harbor, Inc. In 1969, Holiday Realty, Inc., was liquidated. Petitioner's basis in his 30 percent interest in the liquidated corporation was the fair market value of such stock on the date it was received. Held, the fair market value of such 30 percent interest in Holiday Realty, Inc., was $ 1,157.50 on July 29, 1966. Howard A. Hansen, for the petitioners. Gerald W. Leland, for the respondent. IRWIN
IRWIN, Judge: Respondent has determined deficiencies in petitioners' Federal income tax for the calendar year 1969 in the amount of $ 2,781.68. Various concessions having been made, the only issue remaining for our resolution concerns the fair market value of 150 shares of stock of Holiday Realty, Inc., received by Walter G. Andrews in July 1966. FINDINGS OF FACT Most of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Walter G. Andrews and Louise S. Andrews, husband and wife, resided in St. Paul, Minn., at the time of filing the *299 petition in the present case. Louise S. Andrews is a party to these proceedings solely by virtue of having filed a joint Federal income tax return with her husband for the calendar year 1969. Accordingly, the designation "petitioner" will hereafter only refer to Walter S. Andrews. On December 1, 1960, petitioner and Melvin F. Plummer (hereafter referred to as Plummer) formed two corporations, Holiday Harbor, Inc., and Holiday Realty, Inc. (hereafter referred to as Harbor and Realty, respectively). Harbor was formed as an operating company for the operation of a Mississippi River marina which Plummer had previously operated as an individual. Its income was derived from boat and motor sales, slip and dock rentals, service and repairs. Realty was formed as a holding company to hold title to the land, buildings, slips, and miscellaneous equipment used by Harbor in the latter's business operations. Realty's income was derived from the rentals to Harbor of the various items of property mentioned. Harbor was incorporated under the laws of Minnesota with all of its stock being issued to petitioner and Plummer. Plummer was issued 3,271 common shares, or 70 percent, and petitioner 1,402 common *300 shares, or 30 percent. Petitioner's cost basis in his 30 percent interest was $ 10 per share for a total $ 14,020. Realty was also incorporated under the laws of Minnesota with a capitalization of 500 shares of $ 5 par common stock issued at $ 10 per share. Petitioner was issued 350 common shares, or 70 percent, and Plummer received 150 shares, or 30 percent. On July 29, 1966, petitioner and Plummer exchanged their respective minority interests in Harbor and Realty, with petitioner receiving 150 shares of Realty and becoming its sole shareholder in exchange for his 1,402 shares of Harbor. The parties have agreed that the stock exchange was a taxable event. In anticipation of this exchange, Realty sold its land, buildings, slips and equipment to Harbor for $ 214,000 on May 1, 1966. The sales agreement called for $ 1,500 cash, a note receivable of $ 14,000, [1] *301 and a contract for deed of $ 198,500 (calling for monthly payments of $ 1,500 each). Consequently, Realty had no operating assets on July 29, 1966, and was an investment holding company on that date. It was petitioner's intention in 1966 to eliminate an annoying minority interest in Realty so he could have 100 percent control over its investments. Further, the sale of all the Realty property to Harbor just before the exchange was made to enable Harbor to continue its operations and allow Realty to engage in new investments in other areas. One such investment occurred in 1967 when Realty purchased rental real estate in Belvidere, Calif., for $ 60,000. In 1968, Plummer died and, upon the failure of Harbor to continue making payments on the contract for deed after that time, Realty repossessed the land, buildings, slips and equipment sold in 1966. Realty then sold the repossessed property to C. G. Rein Development in 1969 for $ 200,000. In December 1969 Realty was liquidated by petitioner. It is the amount of loss realized by petitioner on such liquidation that the parties have been unable to agree upon. Petitioner received all the assets of Realty and assumed all its *302 liabilities in the liquidation. The liabilities assumed exceeded the assets by $ 42,332.31 as follows: Distribution of cash and property at
fair market value
$ 224,438.76
Liabilities assumed by petitioner on
liquidation
266,771.07
Amount by which liabilities exceed
assets
$ 42,332.31 The solution to the problem of determining the loss realized by petitioner on liquidation lies in the basis of petitioner's 500 shares of Realty stock. The parties have agreed that 350 of those shares had a cost basis of $ 3,500. The basis in the remaining 150 shares of Realty received by petitioner in 1966 in exchange for his 30 percent interest in Harbor is left for our determination. For the taxable years ending October 31, 1961, through October 31, 1969, the balance sheets of Realty reflected the following amounts as assets, liabilities, and shareholder equity: 1961
1962
1963
1964
1965
Assets
Current
$ 12,067
$ 15,015
$ 32,716
$ 8,284
$ 13,816
Fixed
228,371
229,764
238,228
212,136
206,150
Other
11,205
14,412
2,025
2,055
2,055
Total
$ 251,643
$ 259,191
$ 272,969
$ 222,475
$ 222,021
Liabilities
Current
$ 9,716
$ 25,530
$ 42,189
$ 8,265
$ 4,010
Long Term
237,000
233,000
231,000
224,000
224,000
Total
$ 246,716
$ 258,530
$ 273,189
$ 232,265
$ 228,010
Stockholder
Equity
Equity
$ 4,927
$ 661
$ (220)
$ (9,790)
$ (5,989)
1966
1967
1968
1969
Assets
Current
$ 12,591.67
$ 12,146.72
0
0
Fixed
0
60,000.00
$ 63,295.86
$ 66,295.38
Other
212,415.32
207,019.87
211,432.92 [2]
153,875.57 [2]
Total
$ 225,006.99
$ 279,166.59
$ 274,728.78
$ 220,170.95
Liabilities
Current
$ 7,148.66
$ 19,031.16
$ 17,679.99
$ 19,793.19
Long Term
214,000.00
259,000.00
257,604.56
246,261.32
Total
$ 221,148.66
$ 278,031.16
$ 275,284.55
$ 266,054.51
Stockholder
Equity
Equity
$ 3,858.33
$ 1,135.43
$ (555.77)
[45,883.56)
*303 The income and expense statements for Realty for the taxable years 1961 through 1968 showed the net income for those years as follows: 1961 [3]
1962
1963
1964 [4]
1965
1966 [5]
1967
1968
[73)
[4,266)
[881)
[9,570)
$ 1,776
$ 9,847.27
[2,722.90)
[1,691.20)
ULTIMATE FINDING OF FACT The fair market value of the 150 common shares of Realty stock received by petitioner on July 29, 1966, was $ 1,157.50. OPINION Only one disputed fact remains for our resolution. We must determine the fair market value of 150 shares of Realty stock on July 29, 1966. Petitioner contends the value of the Realty stock received was $ 14,020, exactly equal to his basis in the Harbor stock given up. He believes he had no gain or loss on the exchange and, consequently, his basis in the 150 shares of Realty was $ 14,020. This figure, he asserts, represents part of his basis for measuring loss on the liquidation in 1969. [6] *304 Respondent contends that the Realty stock received in 1966 was worth no more than $ 1,157.50. This amount was arrived at by taking 30 percent of the shareholder equity of Realty as reflected on its books for the taxable year ending October 31, 1966. To determine the amount of loss realized by petitioner in 1969 upon liquidation of Realty, we must ascertain petitioner's basis in the Realty stock. The parties have agreed that petitioner's basis in 70 percent of the Realty stock is his cost, $ 3,500. See section 1012, Internal Revenue Code of 1954. [7] *305 Further, the parties have stipulated that petitioner's basis in the remaining 30 percent of the Realty stock (received by petitioner in the 1966 exchange for his 30 percent interest in Harbor) is the fair market value of such stock on the date of exchange. Philadelphia Park Amusement Co. v. United States,126 F.Supp. 184 (Ct. Cl. 1954); Halsey L. Williams,37 T.C. 1099 (1962), acq. 1963-2 C.B. 5. Once again we are presented with the problem of valuing stock of a closely held corporation. Our decision in such cases is at best a process of weighing evidence of expert guesswork. Case law, statutes, regulations and rulings offer little more than generalized guidelines for the valuation of closely held stock. What we are left with is often no more than a question of whether petitioner has produced sufficient evidence to overcome the presumption of correctness of respondent's determination. The issue is a factual one and must be determined in light of all the evidence presented. It is basically a question of judgment rathr than mathematics. Where there are no sales available from which the fair market value of closely held stock can be determined, numerous factors are examined in attempting to arrive at a reasonable value. Such factors include: the earnings record of the corporation, the dividends which it has paid, the book value of the stock, the value of the assets underlying the stock, the history of the company, the prospects of the company, the testimony *306 of expert witnesses, size of the block of stock to be valued, and any other factors which might affect the price a willing buyer would pay a willing seller for the stock. Cf. Estate of Harry Stoll Leyman,40 T.C. 100, 119 (1963), modified on other grounds 344 F. 2d 763 (6th Cir. 1965), opinion of Court of Appeals vacated per curiam 383 U.S. 832 (1966); Estate of Thomas W. Tebb,27 T.C. 671, 675 (1957); Rev. Rul. 59-60, 1959-1 C.B. 237, as modified by Rev. Rul. 65-193, 1965-2 C.B. 370, and as made applicable for income tax purposes by Rev. Rul. 68-609, 1968-2 C.B. 327. No evidence was presented as to some of the factors listed above. We, therefore, confine our discussion only to those factors the parties have argued and on which they rely. Respondent determined the fair market value of the 150 shares of Realty stock received by petitioner in 1966 to be $ 1,157.50 as follows: Looking at the balance sheet of Realty for the taxable year ending October 31, 1966, respondent took the total shareholder equity of $ 3,858.33, reflected therein, as the value of the corporation's 500 shares of common stock. Thirty percent of such equity is $ 1,157.50 and was accordingly used as the value of petitioner's *307 150 shares on the date of exchange. Initially, we note that while we are not required to follow any particular method or approach to valuation (assuming all relevant factors are considered), we think it appropriate for investment holding companies such as Realty to begin our analysis with a determination of the net asset value of the corporation. Hamm v. Commissioner,325 F. 2d 934 (8th Cir. 1963), certiorari denied 377 U.S. 993 (1964); Estate of Maurice Gustave Heckscher,63 T.C. 485 (1975); Estate of Frank A. Cruikshank,9 T.C. 162 (1947). [8] Ordinarily, the term "net asset value" refers to the total fair market value of all corporate assets less total corporate liabilities. Respondent, however, has chosen to use the shareholder equity, as reflected on Realty's books, as being the equivalent of net asset value. Since book value for assets is not necessarily fair market value, we think this method of valuation would in most cases be inaccurate. But the inaccuracies in respondent's method here inure to the benefit of the taxpayer. For reasons stated below, we think the corporate assets on the date of exchange were actually worth less than their book values. Respondent's computation *308 then gives a higher value to the corporation than would be the case if the assets were discounted from their book values to reach fair market values. Since respondent is willing to use the higher value of shareholder equity for the corporation's net asset value, we adopt that figure as being correct. Respondent's expert witness testified, as we find, that the most valuable corporate asset, the contract for deed in the face amount of $ 198,500, would have to be discounted to reflect its fair market value. We agree that a willing buyer would not reasonably pay face value for the contract after considering such factors as: the security behind the contract, the history and future potential of Harbor (the obligor), the equity investment in the property, the length of the term over which payments were to be made, and other factors. Nonetheless, we do not adopt such expert's opinion as to the amount of discount which should be applied. Petitioner has convinced us that *309 many factors were not considered by the expert which should have been considered. However, going into the details of such expert's testimony is unnecessary. Respondent has not used a discounted value for the contract for deed in reaching his determination of the value of stock. Rather, he has taken the contract into consideration at its face value (as reflected on the corporate books). We think respondent has been generous to the taxpayer in his determination, and for that reason find his approach reasonable. A further problem arises from respondent's use of the corporate balance sheet for October 31, 1966. The values of the assets reflected therein are for a date some three months after the transfer. There is, however, no indication of any change in assets or liabilities between July 29, 1966, the date of transfer, and October 31, 1966, with the possible exception of three monthly payments (of $ 1,500 each) which respondent has assumed were made on the contract for deed. Respondent has chosen to include these monthly payments in his computation, again increasing the shareholder equity to petitioner's benefit. Additionally, respondent has not discounted his computation of net asset *310 value, in reaching a value for the stock, to account for the lack of marketability of such stock or for the fact that a minority interest was being transferred. We understand why no discount for a minority interest was taken (as the stock was being transferred to the majority shareholder), but we think a discount for lack of marketability would have been appropriate. However, since respondent has declined to take such a discount in making his determination, and because that again works to the taxpayer's advantage here, we adopt it as a reasonable approach to the valuation of the Realty stock. Directing our attention to the net earnings of Realty at and before the time of transfer in 1966, we see that Realty had experienced losses for the taxable years 1961, 1962, 1963, and 1964. In 1965 there was a gain of $ 1,776, and for the year ending October 31, 1966, the gain reported was $ 9,847.27. While this would appear on the surface to look as if the new corporation was beginning to become profitable, the gain in 1966 was due in large part to the sale of corporate assets to Harbor for a reported gain of $ 11,856.38. Absent this sale, the operating earnings of Realty for the year would again *311 have shown a deficit. We think under these circumstances it would be difficult to ascertain a value for the Realty stock based on the capitalization of corporate earnings. Indeed, neither of the parties has suggested such a figure (nor a figure based on dividend yield) and we decline to do so as well. Other than petitioner's own testimony that he believed the value of the Realty stock received by him in 1966 to be equal to $ 14,020 (the same as his basis in the Harbor stock given up), there is virtually no evidence presented in the record to sustain such a belief. True, the transaction was an arm's-length exchange. But this tells us little more than the two blocks of stock exchanged were of equal value. It says nothing of what that value was. While petitioner has argued vigorously that the discounted value of the contract for deed computed by respondent's expert was erroneous, he has not offered any evidence other than his opinion of what the contract was worth. As indicated above, we are persuaded by petitioner that the value arrived at by respondent's expert is unreliable. Nonetheless, we have found the expert's testimony convincing on the point that a discount of some amount is *312 appropriate. In spite of all this, however, respondent has not discounted the contract at all in reaching his ultimate determination of value. Had petitioner offered evidence that a higher value for the contract (or other assets) than that used by respondent was appropriate, we could understand his complaint. But this he has not done. Nor has he shown us the facts underlying his opinion that the Realty stock had a value of $ 14,020 on the date of transfer in 1966. We think petitioner is sincere in his belief that he had no gain or loss on the transfer in 1966. A loss in that year would have been useful to him in offsetting his other capital gains. He has in all respects turned a square corner with his Government. Unfortunately, we must conclude petitioner's belief is not supported by the evidence. [9]
Having viewed all the evidence presented, including the stipulations of fact, the testimony of the witnesses, and the exhibits presented, we find that respondent's determination of the value of the 150 shares of Realty stock received *313 by petitioner in 1966 is correct. That value is $ 1,157.50, and represents petitioner's basis in those 150 shares when the corporation was liquidated in 1969. Since petitioner has conceded the correctness of all of respondent's other adjustments in the notice of deficiency, Decision will be entered for the respondent.
Footnotes
1. Petitioner testified that the note was for $ 40,000 and that since he considered it as "bankable cash" his total down payment was some $ 41,000 or $ 42,000. However, the terms of the agreement called for a note in the amount of $ 14,000, and since the parties have stipulated to this latter figure, we adopt it as the correct amount of the note.
2. This figure includes current assets.↩
3. The first taxable year of Realty consisted of eleven months. ↩
4. Total losses in 1964 included a $ 9,714 loss on the sale of a piece of equipment in that year. ↩
5. Gross income in 1966 included $ 11,856 reported gain on the sale of assets to Harbor in that year.↩
6. According to petitioner, a finding in his favor in this case would necessitate a refund of taxes in the amount of $ 1,006.76. This does not raise any new issues. It merely results from recomputing petitioner's tax using the figures which he contends are appropriate.
7. All statutory references hereafter refer to the Internal Revenue Code of 1954, as in effect for the years relevant to this litigation.
8. See also, Edwin A. Gallun,T.C. Memo. 1974-284; Estate of Alvin Thalheimer,T.C. Memo. 1974-203; Estate of Lucretia Eddy Cotchett,T.C. Memo. 1974-31; Paulina DuPont Dean,T.C. Memo. 1960-54; Rev. Rul. 59-60, 1959-1 C.B. 237↩.
9. Petitioner's remedy, if one exists, may be under sections 1311-1315, but a decision on the applicability of those sections must be made in a different proceeding.↩