EDWIN A. GALLUN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent EVELYN J. GALLUN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gallun v. Commissioner
Docket Nos. 2729-73, 2730-73.
United States Tax Court
T.C. Memo 1974-284; 1974 Tax Ct. Memo LEXIS 34; 33 T.C.M. (CCH) 1316; T.C.M. (RIA) 740284; November 6, 1974, Filed. *34 Held: The value of certain stock of a closely-held corporation is determined. Wayne J. Roper, Richard S. Gibbs, and John W. Hein, for the petitioners. F. Patrick Matthews and Denis J. Conlon, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent has determined the following deficiencies in petitioners' Federal gift tax for the year 1969: Docket No.
Amount 2729-73
$12,726.24
2730-73
11,930.85
The only issue for decision is the valuation of certain stock of a closely-held corporation that petitioner, Edwin A. Gallun, gave to members of his family. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners are Edwin A. Gallun (hereinafter referred to as petitioner) and Evelyn *35 J. Gallun, husband and wife, who resided in Chenequa, Wisconsin, at the time of the filing of the petition herein. On September 29, 1969, petitioner made a gift of 400 shares of common stock of A.F. Gallun & Sons Corporation to members of his family. On April 15, 1970, petitioner and his wife each filed a United States Gift Tax Return for the year 1969 with the district director of internal revenue at Milwaukee, Wisconsin. On these returns petitioner and his wife reported the value of the Gallun stock at $396.24 per share. In his notices of deficiency, respondent determined that the value of the Gallun stock on September 29, 1969, was $661.37 per share. A.F. Gallun & Sons Corporation (hereinafter referred to as the Corporation), a Delaware corporation organized on December 16, 1935 and using a fiscal year ending September 30, is a leather tanning company located in Milwaukee, Wisconsin. In addition to its leather-tanning operation and the land, buildings and equipment pertinent thereto, the Corporation holds a large investment portfolio consisting of stocks and bonds having on September 30, 1969, an aggregate quoted market value of $18,087,263.00. On September 29, 1969, the *36 Corporation had 15,722 shares of common stock outstanding. The Corporation was at all times a closely-held company in that substantially all of its shares were and are held by members of the Gallun family and descendants of the founders of the Corporation or by trusts for their benefit. Prior to the subject gift of the 400 shares of the Corporation, the petitioner Edwin A. Gallun was the largest shareholder in the Corporation, owning then 4,617.5 shares of 28.7 percent of the common stock outstanding. The condensed balance sheet of the Corporation as of September 30, 1969, with comparative figures for 1968, and its earnings statements for the years 1968 and 1969 are as follows: BALANCE SHEET
1968
1969 ASSETS
Current Assets
Cash
$ 38,359
$ 36,796
Accounts Receivable-Net
846,686
806,167
Inventories
2,515,804
2,387,545
Prepaid Expenses
15,833
32,886
$3,416,682
$3,263,394
Investments
Bonds, at cost
$ 368,818
$ 353,448
Stocks, at cost
3,347,798
4,134,358
Land Contract
37,233
31,201
Cash Surrender Value of Life Insurance
590,457
609,787
$4,344,306
$5,128,794
Property, Plant & Equipment, at cost
Land
$ 136,743
$ 142,045
Buildings
1,333,383
1,342,285
Equipment
1,867,830
1,984,536
$3,337,956
$3,468,866
Less Accumulated Depreciation
2,391,618
2,386,569
$ 946,338
$1,082,297
Total Assets
$8,707,326
$9,474,485
LIABILITIES and STOCKHOLDERS EQUITY
Current Liabilities
Notes Payable
$ 544,500
$ 539,000
Accounts Payable
614,612
455,569
Dividend Payable
47,166
94,332
Accrued Expenses
391,106
443,262
Income Taxes
68,231
227,779
$1,665,615
$1,759,942
Deferred Income Taxes
$ 130,200
$ 138,900
Long Term Debt
339,326
503,800
Stockholders Equity
Common Stock
$2,660,000
$2,660,000
Paid-in Capital
301,384
301,384
Retained Earnings
4,108,327
4,607,985
Less: Treasury stock
( 497,526)
( 497,526)
$6,572,185
$7,071,843
Total Liabilities and Stockholders Equity
$8,707,326
$9,474,485
EARNINGS STATEMENTS
1968
1969
Net Sales
$8,068,937
$9,705,117
Cost of Sales
7,103,438
8,339,845
Gross Profit
965,499
1,365,272
Less: Selling and Administrative Expenses
778,900
907,391
Operating Profit
186,599
457,881
Other Income
Interest and Dividends
495,891
559,376
Gain on Disposal of Investment Securities
13,587
175,419
Miscellaneous
58,970
174,125
568,448
908,920
Other Charges
165,456
272,537
Earnings Before Income Tax
589,591
1,094,264
Income Taxes
104,000
233,000
Net Earnings
485,591
861,264
Dividends Paid Per Share
$18.00
$23.00
Earnings retained at beginning of year
$2,575,072
$2,212,667
Add: Net earnings
485,591
861,264
Deduct: Dividends paid
282,996
361,606
Earnings retained at end of year
2,777,667
2,712,325
*37 The following table sets forth pertinent data relating to the Corporation for the periods indicated: Year
Earnings Per Share
Dividends Per Share 1965
$ 2.86
$ 10.00
1966
(0.20)
12.50
1967
44.80
16.50
1968
30.89
18.00
1969
54.78
23.00
ULTIMATE FINDING OF FACT The fair market value of the stock in issue on the date of the gift in issue was $520.00 per share. OPINION The only issue for decision is the valuation of 400 shares of stock in the A.F. Gallun & Sons Corporation. Generalized guidelines for such a valuation are contained in section 2031, Internal Revenue Code of 1954, section 20.2031-2(f), Estate Tax Regs., and Rev. Rul. 59-60, 1959-1 C.B. 237. The two expert witnesses offered by petitioner and respondent's expert witness are in agreement that the value of the underlying assets must be emphasized in our determination and that the proper approach is to value first the tannery operation of the Corporation and then value the investment assets held by it. The assets of the tannery operation were valued *38 by petitioner's witnesses at $2,708,900 and $1,470,636. Although we might have anticipated that the respondent's witness would place a higher value on this operation, he has valued it at only $415,000. We find that the value of the tannery operation on September 30, 1969, was $900,000. In arriving at this finding, we have relied only on testimony supporting the two lower valuations. The higher valuation basically represents a computation of the net worth of the tannery operation that we find inappropriate. The tannery operation is one of only a few remaining in the United States and represents an industry that is declining because of foreign competition and the increasing costs of hides. The performance of the tannery operation has been mediocre and it would be difficult to find an investor willing to invest in such an operation. The valuation of $1,470,636 represents the value of the current assets held by the tannery operation. This approach is based on the opinion that the fixed assets of the tannery are worth little. Because of the declining state of the tannery industry in the United States, we believe that any sale of the current assets of the tannery would necessarily *39 be at a discount so that the value of the current assets on the Corporation's books is in excess of the fair market value of the tannery operation. The valuation of $415,000 is based primarily on a comparison of the tannery operation to the operations of Seton Company, a publicly traded corporation that had some leather operations. In our opinion Seton does not provide a good comparison because it made a different kind of leather and also was engaged in chemical operations. Because both of these valuations have certain defects, we have relied exclusively on neither but have taken both of them into account in arriving at our determination. In valuing the investment assets of the Corporation, we first must determine the net asset value of the investment portfolio. We believe that the computation of respondent's witness accurately determines this figure. Respondent's witness observed that the market values of all the stocks and bonds held by the Corporation could be readily determined. He noted, however, that an adjustment for blockage was necessary in the case of two large blocks of stock included in the stock portfolio. He first discounted the market price of those stocks and *40 then took into account the estimated expenses of underwriting a registered secondary public offering. Based on this computation, we find that the net asset value of the investment portfolio was $16,204,439.
Our next step in determining the fair market value of the Gallun stock is to determine the proper discount to be applied against this net asset value. The parties urge that we take into account various factors, such as lack of marketability, the retention of income not present in a publicly-traded investment company, the minority interest of the shares being valued and the potential capital gains tax if the stocks and bonds were to be liquidated by the Corporation. The respondent's witness advocated that the net asset value should be discounted by 20 percent to take into account these various factors. Petitioner's first expert witness, Snyder, first discounted the fair market value of the investment assets by 33 percent to account for the potential capital gains tax if the investment portfolio were to be liquidated. He reduced the resulting figure by an additional 35 percent in recognition of the lack of control of a minority stockholder over operations and his inability to *41 force a liquidation and thereby arrived at a figure of $734.59 per share. He averaged this figure with a second figure determined by capitalizing earnings for five years at a rate of seven times and with a third figure which would result in a 9 percent dividend yield. He thereby arrived at a value of $396.24. Petitioner's other expert witness, Baer, first discounted the market value of the investment portfolio by 31 percent to reflect a potential capital gains tax. He further discounted the resulting figure by 24 percent, which he derived by comparing the Corporation's investments to those of Amoskeag, a closed-end investment company. He then discounted the value of the tannery operation and the investment assets by 50 percent to reflect the non-marketability of the tannery operation, the minority interest of the shares being valued and the lack of marketability. In arriving at our determination we have rejected the argument of petitioner that a discount should be allowed for a potential capital gains tax that would result if the investment portfolio were to be liquidated. The record does not establish that the management of the portfolio had any immediate plans to liquidate *42 the investment portfolio. Furthermore, it is possible that the management at some time in the future may dispose of certain or all of the investment assets without incurring a capital gains tax. Under these circumstances, such a discount is not appropriate. See Estate of Frank A. Cruikshank, 9 T.C. 162 (1947); Estate of Alvin Thalheimer, T.C. Memo. 1974-203. On the other hand, we believe that the respondent's witness erred in refusing to discount the value of the stock to account for a corporate entity intervening between the investment assets and the owner of Gallun stock. Respondent's witness reasoned that the Corporation could be compared to eight publicly traded, closed-end investment companies and that accordingly no discount was in order because the stock in the closed-end investment companies was not selling at a discount at the time of the gift. We do not agree that such a comparison is valid, since the shares of the closed-end investment companies are readily marketable and the companies are entitled to certain tax benefits as regulated investment companies. Taking into account not only the arguments we have discussed but also the additional *43 factors brought to our attention by the parties, we have concluded that the net asset value of the investment portfolio should be discounted by 55 percent. Thus, we find that the fair market value of the investment portion of the Corporation's business was $7,292,000. Adding the value of the tannery operation to this figure, dividing by the number of shares outstanding and rounding, we find the fair market value of the Corporation's stock was $520 on the date in issue. Based on the $23 dividend in 1969, the highest in a five-year period, the return on the Corporation's stock would be 4.4 percent at $520. Considering the declining state of the tannery industry and the non-marketable nature of the Corporation's stock, we do not believe that an investor would be willing to accept a lower return. This factor was an additional consideration in convincing us that a substantial discount of underlying net asset value was necessary. Decisions will be entered under Rule 155.