Irene **EISENBERG**, Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent–Appellee.

**Docket No. 97–4331.**

United States Court of Appeals, Second Circuit.

Argued May 19, 1998.

Decided Aug. 18, 1998.

Martin A. Stoll, New York, New York, for Petitioner–Appellant.

David I. Pincus, Tax Division, Department of Justice, Washington D.C., (Loretta C. Argrett, Assistant Att. Gen., Tamara W. Ashford, Attorney), for Respondent–Appellee.

Before: WINTER, Chief Judge, JACOBS, Circuit Judge, and CARMAN, Chief Judge.[1]

CARMAN, Chief Judge:

## BACKGROUND [2]

Appellant, Irene Eisenberg, owned all 1,000 shares of the issued and outstanding

---

1. Honorable Gregory W. Carman, Chief Judge of the United States Court of International Trade, sitting by designation.

2. The facts set forth below are drawn from the August 8, 1996 Stipulation of Facts agreed to by the parties and adopted in the Tax Court's opinion and order.

common stock of Avenue N Realty Corporation (the Corporation), its only class of stock. The Corporation, a C corporation[3] for tax purposes during 1991, 1992 and 1993, the years in issue, was organized under the laws of the State of New York. The Corporation's only fixed asset was a commercial building located at 4901–4911 Avenue N, Brooklyn, New York, which it owned and leased to third parties. The Corporation's only active trade or business was the rental of the building. The Corporation did not have plans to liquidate, or to sell or distribute the building.

In 1991, 1992 and 1993 appellant gifted shares of the Corporation to her son and two grandchildren. When valuing the stock for gift tax purposes, appellant reduced the value of the stock by the full amount of the capital gains tax[4] that she would have incurred had the Corporation liquidated, or sold or distributed its fixed asset. Appellant computed the potential capital gains tax by assuming hypothetical annual sales of the property, and the parties stipulated to the amount of capital gains that would have been realized from the hypothetical sales.[5]

On July 18, 1995, appellant received a notice of deficiency from the Commissioner identifying deficiencies in gift tax of $20,157.99, $38,257.15 and $3,319.55 for the years 1991, 1992 and 1993, respectively. The deficiencies were based solely on the Commissioner's determination that the values reported on appellant's tax return should not have included reductions in the stock's value to account for potential capital gains tax liabilities. On September 5, 1995, appellant filed a petition in the United States Tax Court contesting the Commissioner's determination she was not entitled on her federal tax returns to reduce the fair market value of the gifted stock by the amount of capital gains tax the Corporation would have incurred if it were to liquidate, or to distribute or sell its commercial building.

 The parties filed cross motions for summary judgment in August and September, 1996. The parties agreed that the net-asset-value method[6] was appropriate for valuing the gifted stock in this case, stipulated to a 25% minority discount,[7] agreed on the fair market value of the property and agreed on the valuation of the shares of stock as reported on petitioner's gift tax returns. The only issue between the parties, therefore, was the valuation reduction for the capital gains tax liabilities.[8]

On October 27, 1997, the Tax Court granted appellee's motion for summary judgment and denied appellant's motion, holding appel-

---

3. A "C" corporation refers to a corporation governed by the tax rules contained in subchapter C of the Internal Revenue Code. *See* 26 U.S.C. §§ 301–385 (1988). Although the Corporation made an election, effective January 1, 1987, to be treated as a subchapter S corporation, its election was revoked on January 1, 1989. Thereafter, the Corporation was a C corporation.

4. The capital gains tax consists of the aggregated Federal Income Tax, New York State Franchise Tax on Business Corporations, and New York City General Corporation Tax (collectively the capital gains tax).

5. The parties agreed that on the first transfer date, the fair market value of the property was $600,000, and the fair market value of the stock was $517.20 per share. The property's adjusted basis was $69,500. A hypothetical sale of the property would have led to a capital gain of $530,500. On the second transfer date, the fair market value of the property was $470,000, and the fair market value of the stock was $356.71 per share. The property's adjusted basis was $67,906. A hypothetical sale of the property would have led to a capital gain of $402,094. On

the third transfer date, the fair market value of the property was $470,000, and the fair market value of the stock was $341.77 per share. The property's adjusted basis was $67,108. A hypothetical sale of the property would have led to a capital gain of $402,892. *See* Joint App. at A–25, A–27.

6. Under the traditional "net asset value" method, the value of the underlying corporation is considered to be equal to the difference of the fair market value of the corporation's assets and its liabilities. *See Andrews v. Commissioner,* 35 T.C.M. (CCH) 459, 463, 1976 WL 3301 (1976).

7. A minority discount reflects the lower value of minority shares due to the minority shareholder's inability to influence corporate decisions, such as a liquidation or the sale or distribution of the property.

8. The valuation reduction for unrealized capital gains is the reduction claimed by the appellant with respect to each transfer date for the aggregated Federal Income Tax, New York State Franchise Tax on Business Corporations, and New York City General Corporation Tax.

lant was not entitled on her federal tax returns to reduce the fair market value of the shares of stock she gifted to her relatives by the amount of capital gains tax the Corporation would incur if it were to liquidate, or to sell or distribute its sole asset. The Tax Court held firmly-established precedent dictated no reduction in the value of closely held stock may be taken to reflect the potential capital gains tax liability where evidence fails to establish a liquidation or sale of the corporation or its assets is likely to occur, reasoning the tax liability is purely speculative. The Tax Court also found there was no showing that a hypothetical buyer would purchase the Corporation with a view toward liquidating the Corporation or selling its asset, such that the potential tax liability would be considered a material or significant concern.

On October 31, 1997, the Tax Court entered an order and decision finding deficiencies in gift tax due from appellant for the taxable years 1991, 1992 and 1993 in the amounts of $20,157.99, $38,257.15 and $3,319.55, respectively. Appellant challenges this order and decision.

This Court must decide whether, for gift tax purposes, appellant is entitled to reduce the fair market value of her C corporation stock to take into account potential capital gains tax liabilities that may be incurred if the Corporation liquidated, or distributed or sold its sole asset where no liquidation, sale or distribution was contemplated as of the stock transfer dates.

## DISCUSSION

We review *de novo* a grant of summary judgment. Summary judgment is properly granted where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See, e.g., Briones v. Runyon,* 101 F.3d 287, 291 (2d Cir.1996). This Court has jurisdiction pursu-

ant to 26 U.S.C. § 7482(a)(1) (1994) and 28 U.S.C. § 2106 (1994).

Section 2501 of the Internal Revenue Code imposes a gift tax "on the transfer of property by gift during [the] calendar year by any individual." 26 U.S.C. § 2501(a)(1) (1988). Section 2512(a), which addresses the valuation of gifts, states, "[i]f the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." 26 U.S.C. § 2512(a) (1988). In interpreting this provision, section 25.2512–1 of the Treasury Regulations on gift tax provides, "[t]he value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512–1 (1992).

The value of a gift on which a tax is paid is generally determined by ascertaining the fair market value of the property at the time the gift is transferred. Where, as here, the gift is stock, its value for gift tax purposes is the fair market value of the stock on the date of the transfer, and "[a]ll relevant facts and elements of value as of the time of the gift shall be considered." 26 C.F.R. § 25.2512–1 (1992). For publicly traded stock, valuation can generally be based on market selling prices. *See* 26 C.F.R. § 25.2512–2(b) (1992). For closely held corporations, such as Avenue N, for which there is no public trading market, valuation of stock is based on of a variety of factors.[9] In this case, the parties stipulated to the fair market value of the property and the shares of stock on each of the transfer dates. *See supra,* note 5.

### Valuation Reduction for Unrealized Capital Gains

The Tax Court has consistently held, in valuing closely held stock using the net asset

---

**9.** Revenue Ruling 59–60 outlines the general approach, methods and factors to be considered in valuing the shares of stock of closely held corporations for estate and gift tax purposes. The ruling states:

> 3.01. A determination of fair market value, being a question of fact, will depend upon the circumstances in each case. No formula can be devised that will be generally applicable to

> the multitude of different valuation issues arising in estate and gift tax cases.... A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.

> Rev. Rul. 59–60, 1959–1 C.B. 237, 238.

value method, that a special reduction of the value of the stock for potential capital gains tax liabilities at the corporate level is unwarranted where there is no evidence that a tax-triggering event, such as a liquidation or sale of the corporation's assets, is likely to occur. *See, e.g., Ward v. Commissioner,* 87 T.C. 78, 103–04, 1986 WL 22156 (1986) (finding when liquidation only speculative, costs of selling real estate and taxes that would be recognized upon liquidation not taken into account); *Estate of Piper v. Commissioner,* 72 T.C. 1062, 1087, 1979 WL 3788 (1979) (determining no discount for potential capital gains tax at corporate level where there is no evidence a liquidation of the investment companies was planned or could not have been accomplished without incurring capital gains taxes at corporate level); *Estate of Cruikshank v. Commissioner,* 9 T.C. 162, 165, 1947 WL 28 (1947) (finding tax on appreciation to be "hypothetical and supposititious" because there was no demonstrated intent to liquidate assets, and in any case, liquidation could occur without taxing the corporation).

In the past, the denial of a reduction for potential capital gains tax liability was based, in part, on the possibility that the taxes could be avoided by liquidating the corporation. The law in this area, embodied in the Internal Revenue Code of 1954, was loosely based on the Supreme Court decision in *General Utilities & Operating Co. v. Helvering,* 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154 (1935), which held that a corporation did not recognize gain on a dividend distribution of appre-

ciated property. *Id.* at 206, 56 S.Ct. 185. The *General Utilities* doctrine operated as an exception to the double taxation that applied to C corporations and their shareholders, *i.e.,* taxation once at the corporate level and a second time at the shareholder level upon the distribution of corporate earnings to shareholders. *See United States v. Cumberland Pub. Serv. Co.,* 338 U.S. 451, 452 n. 2, 455, 70 S.Ct. 280, 94 L.Ed. 251 (1950) (finding "[n]o gain or loss is realized by a corporation from the mere distribution of its assets in kind in partial or complete liquidation, however they may have appreciated or depreciated in value since their acquisition" and finding "a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation"). By employing the *General Utilities* doctrine, a corporation could liquidate and distribute appreciated or depreciated property to its shareholders without recognizing built-in gain or loss, and thus could circumvent double taxation. *See* 26 U.S.C. §§ 311, 336, 337 (1958).[10]

### Tax Reform Act of 1986

■ These tax-favorable options ended with the enactment of the Tax Reform Act of 1986(TRA), Pub.L. No. 99–514, § 631, 100 Stat. 2085, 2269 (codified as amended in scattered sections of 26 U.S.C.), which abrogated the *General Utilities* doctrine for liquidations after 1986 and rejected tax principles that were more than half a century old.[11] The

10. Section 311 provided:

§ 311. Taxability of corporation on distribution.

(a) General rule.

Except as provided in subsections (b) and (c) of this section and section 453(d), no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of—

(1) its stock (or rights to acquire its stock), or

(2) property.

26 U.S.C. § 311(a) (1958). Section 336 provided:

§ 336. General rule.

Except as provided in section 453(d) (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation.

26 U.S.C. § 336 (1958). Section 337 provided:

§ 337. Gain or loss on sales or exchanges in connection with certain liquidations.

*General rule.*

If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12–month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12–month period.

26 U.S.C. § 337(a) (1958).(a)(b)

11. In addition to several explicit statutory exceptions, Congress created more and more exceptions to the general rule of non-recognition, especially with respect to gains on non-liquidating distributions of appreciated property. *See* Boris

TRA removed a corporation's ability to avoid recognition of a gain on the distribution of appreciated property to its shareholders, irrespective of whether the gain occurred in a liquidating or nonliquidating context.[12] The TRA's abrogation of the *General Utilities* doctrine reflected an effort to preserve the integrity of the system of double taxation of corporate gain.[13] *See* H.R. Conf. Rep. No. 99–841, at 204 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4292.

The TRA amended 26 U.S.C. §§ 336, 337 and 311 and added new provisions 26 U.S.C. §§ 311(b) and 336(a) to provide for the corporate level recognition of gain on distributions or sales of appreciated property. Section 336(a), relating to complete liquidations, provides for the recognition of gain or loss to a corporation on the distribution of property in complete liquidation as if the property were sold at its fair market value. The statute states:

**(a) General Rule**

Except as otherwise provided in this section or section 337, gain or loss shall be recognized to a liquidating corporation on the distribution of property in complete liquidation as if such property were sold to the distributee at its fair market value.

26 U.S.C. § 336(a) (1988). The statutory rule is subject to only a few exceptions and abrogates the *General Utilities* doctrine.

Section 311(b), relating to nonliquidating distributions, requires a corporation to recognize gain on nonliquidating distributions of appreciated property as if the corporation had sold the property for its fair market value except as to distributions in tax-free reorganizations and similar transactions. *See* Boris I. Bittker and James S. Eustice, *Federal Income Taxation of Corporations and Shareholders,* § 8.21 (6th ed.1998). The statute specifically states:

**(b) Distributions of appreciated property**

**(1) In general**

If-

(A) a corporation distributes property (other than an obligation of such corporation) to a shareholder in a distribution to which subpart A applies, and

(B) the fair market value of such property exceeds its adjusted basis (in the hands of the distributing corporation),

then gain shall be recognized to the distributing corporation as if such property were sold to the distributee at its fair market value.

26 U.S.C. § 311(b) (1988).

Since it is a virtual certainty that capital gains tax will ultimately be realized in this case due to the changes brought about by the TRA,[14] the question before us is whether we

---

I. Bittker and James S. Eustice, *Federal Income Taxation of Corporations and Shareholders,* §§ 8.20, 8.21 (6th ed.1998) (hereinafter Bittker) for further discussion of the legislative repeal of the *General Utilities* doctrine.

12. A liquidating distribution is a distribution by a corporation that is in complete liquidation of the entity's trade or business activities. A nonliquidating distribution is a payment made by a corporation to the entity's owner(s) when the entity's legal existence does not cease thereafter.

13. Congress offered this rationale:

[T]he *General Utilities* rule tends to undermine the corporate income tax. Under normally applicable tax principles, nonrecognition of gain is available only if the transferee takes a carryover basis in the transferred property, thus assuring that a tax will eventually be collected on the appreciation. Where the *General Utilities* rule applies, assets generally are permitted to leave corporate solution and to take a stepped-up basis in the hands of the

transferee without the imposition of a corporate-level tax. Thus, the effect of the rule is to grant a permanent exemption from the corporate income tax.

Bitter, *supra* note 11, at § 8.20[4] (quoting H.R.Rep. No. 99–426, at 282 (1985) (footnote omitted)). Bittker notes the report also asserted that a pre–1986 discrepancy between the treatment of liquidating and nonliquidating distributions may have artificially encouraged corporate mergers and acquisitions, despite economic reasons for a different course of action. *Id.* at note 319.

14. Exceptions exist but they do not apply to the facts of this case. For example, a subchapter C corporation can avoid recognition of gain if the corporation converts to a subchapter S corporation and retains the assets for a period of ten years. *See generally* 26 U.S.C. §§ 1374, 1374(d)(7) (1988). If a corporation is eligible for a subchapter S election, therefore, a technique does exist for avoiding recognition of gain. *See, id.*

agree with the reasoning of the Tax Court that the capital gains tax liability is too speculative to be valued as of the date of the gift where no liquidation, sale or distribution of the Corporation was planned.

### Determining Fair Market Value for Gift Tax Purposes

■ Appellant argues as a result of the abrogation of the *General Utilities* doctrine, Avenue N Realty Corporation cannot avoid the capital gains tax liability on the property and no willing buyer of the Corporation's stock would pay an amount that did not take into account a reduction in the stock's value for the amount of the potential capital gains tax. Appellant contends the cases relied upon by the appellee and the Tax Court have lost their vitality as a result of the TRA and argues any hypothetical willing buyer would likely reduce the purchase price by the tax, thereby justifying a discount for the built-in gain.

Appellee argues a hypothetical willing buyer still has the option of avoiding the imposition of capital gains tax through the purchase of corporate stock and the continuation of the business by leasing the property in question through the corporate form. Appellee also argues based upon the undisputed fact that Avenue N did not have a plan to liquidate, or to distribute or sell the appreciated building, appellant is not entitled to reduce the value of the corporate stock for gift tax purposes based on a purely speculative and uncertain event. Appellee maintains even if it were certain a hypothetical buyer would eventually cause the corporate level capital gains tax to be triggered, the amount of the eventual tax is too speculative to take into account because it would be impossible to determine currently when the tax-triggering event would take place and thus, what the capital gains tax rate would be. Appellee additionally maintains it cannot be known what the value of the property would be when the recognizing event occurs and whether the sale or distribution would result in a gain or loss.

We disagree with appellee's arguments and find appellant's contentions to be more persuasive. Appellee's argument that the best and most likely uses of the property are to continue indefinitely its current use or to make a subchapter S election are not supported by the evidence presented to us. Ap-

---

Nevertheless, where there was no evidence of intent by a subchapter C corporation to convert to a subchapter S corporation, the Tax Court rejected the likelihood that a subchapter S election would be implemented. *Estate of Davis v. Commissioner,* Daily Tax Report (BNA) No. 126, at K–12, K19 (T.C. June 30, 1998). In *Estate of Davis,* the Court rejected the respondent's assumptions that the corporation could have avoided all built-in capital gains tax by having it elect S corporation status and by not permitting it to sell any of its assets for ten years where the record did not indicate it was likely the corporation would have converted to an S corporation and where the record did not establish that there was any other way as of the valuation date by which the corporation could have avoided the tax. *Id.*

In addition to a ten-year holding period possibly to avoid potential capital gains tax liability, an S corporation election may present other cumbersome consequences. *See* 26 U.S.C. § 469 (limiting passive activity losses for active participation in a rental activity to a maximum of $25,000 per year related to the rental real estate and phasing out deduction for passive activity loss as the taxpayer's adjusted gross income reaches certain levels).

In any event, the practical remoteness of a subchapter C corporation converting to a subchapter S corporation and holding the assets for ten years would seem to be a matter that could easily be taken into account by those valuing the gift for gift tax purposes.

Appellant could also defer gain recognition indefinitely by having the Corporation retain the property and continue leasing it to third parties. This option, however, would not eliminate the fact that gain will be triggered by a sale or distribution in liquidation of the corporate property. The Corporation's sale of the property on any of the transfer dates (and on any future date) would produce gain to the Corporation under 26 U.S.C. § 1001, which would subject the Corporation to taxes on the existing gain either in the year of sale, over a deferred period of years or both, depending on the terms of the sale. The Corporation's distribution of the property to its shareholders not in complete liquidation would also result in recognized gain to the Corporation under 26 U.S.C. § 311(b), which would subject the Corporation to taxes on the existing gain in the year of the distribution. The Corporation's distribution of the property to its shareholders in complete liquidation would also result in recognized gain to the Corporation under 26 U.S.C. § 336(a), which would subject the Corporation to taxes on the existing gain in the year of the distribution.

pellee cites numerous cases addressing the impact of contingent tax liability on fair market value, but the valuation dates in those cases precede the abrogation of the *General Utilities* doctrine, when corporations could still distribute appreciated assets to shareholders without an additional tax at the corporate level. *See, e.g, Estate of Andrews v. Commissioner,* 79 T.C. 938, 942, 1982 WL 11197 (1982); *Estate of Piper,* 72 T.C. at 1086–87; *Estate of Cruikshank,* 9 T.C. at 165.

While appellee argues that prior to the enactment of the TRA, courts disallowed discounts for contingent tax liability because they considered the tax liability to be too speculative, many courts also based their decisions on the ability of the corporation to avoid the corporate taxes altogether. *See Estate of Piper,* 72 T.C. at 1087 (disallowing a discount for potential capital gains tax at the corporate level where there was no evidence that a liquidation was planned *or* that it could not have been accomplished without incurring capital gains taxes at the corporate level and citing pre-TRA sections of the Code which allowed avoidance of capital gains taxes at the corporate level); *Gallun v. Commissioner,* 33 T.C.M. (CCH) 1316, 1321 (1974) (disallowing a discount because court found record did not establish management had any immediate plans to liquidate *and* that it was possible "that the management at some time in the future may dispose of certain or all of the investment assets without incurring a capital gains tax"); *Estate of Cruikshank,* 9 T.C. at 165 (disallowing a discount as based on "hypothetical and supposititious" tax liability since there was no demonstrated intent to liquidate assets, *and,* in any case, there could be a liquidation without tax at the corporate level). Now that the TRA has effectively closed the option to avoid capital gains tax at the corporate level, reliance on these cases in the post-TRA environment should, in our view, no longer continue.

█ As stated above, 26 U.S.C. §§ 2501(a)(1) and 2512(a) impose a gift tax on property measured by the value of the property at the time of the gift. In this case, the parties agreed on the fair market value of the property and the shares of stock on the three transfer dates, but disagreed on the issue of whether, in determining the Federal gift tax value of the stock, a discount for the unrealized capital gains tax liability should reduce the fair market value. Fair market value is based on a hypothetical transaction between a willing buyer and a willing seller, and in applying this willing buyer-willing seller rule, "the potential transaction is to be analyzed from the viewpoint of a hypothetical buyer whose only goal is to maximize his advantage.... [C]ourts may not permit the positing of transactions which are unlikely and plainly contrary to the economic interest of a hypothetical buyer...." *Estate of Curry v. United States,* 706 F.2d 1424, 1428–29 (7th Cir.1983) (citations omitted). Our concern in this case is not whether or when the donees will sell, distribute or liquidate the property at issue, but what a hypothetical buyer would take into account in computing fair market value of the stock. We believe it is common business practice and not mere speculation to conclude a hypothetical willing buyer, having reasonable knowledge of the relevant facts, would take some account of the tax consequences of contingent built-in capital gains on the sole asset of the Corporation at issue in making a sound valuation of the property.

We disagree with the Commissioner's reasoning that the critical point in this case is that there was no indication a liquidation was imminent or that "a hypothetical willing buyer would desire to purchase the stock with the view toward liquidating the corporation or selling the assets, such that the potential tax liability would be of material and significant concern." *Eisenberg v. Commissioner,* 74 T.C.M. (CCH) 1046, 1048–49, 1997 WL 663171 (1997). The issue is not what a hypothetical willing buyer plans to do with the property, but what considerations affect the fair market value of the property he considers buying. While prior to the TRA any buyer of a corporation's stock could avoid potential built-in capital gains tax, there is simply no evidence to dispute the fact that a hypothetical willing buyer today would likely pay less for the shares of a corporation because of the buyer's inability to eliminate the contingent tax liability. *See* John Gilbert,

*After the Repeal of General Utilities: Business Valuations and Contingent Income Taxes on Appreciated Assets,* Mont. Law, Nov. 1995, at 5 (citing a 1994 study that analyzed the impact of contingent tax liability on a buyer of a private, closely-held corporation and concluded a large majority of buyers would discount the stock and negotiate a lower purchase price due to the existence of a contingent tax liability on the corporation's appreciated property).

A recent decision issued by the Tax Court further supports our reasoning in this case. In *Estate of Davis,* which examines whether to discount the value of stock to account for the corporation's built-in capital gains tax, both petitioner's and respondent's experts recommended the built-in capital gains tax be taken into account as a factor in ascertaining the fair market value of the stock in question, even though no liquidation of the corporation or sale of its assets was planned. *See Estate of Davis v. Commissioner,* Daily Tax Report (BNA) No. 126, at K–17 (T.C. June 30, 1998). The Tax Court "reject[ed] respondent's position that, as a matter of law, no discount or adjustment attributable to [the corporation's] built-in capital gains tax is allowable," *id.* at K–18, and noted the cases relied on by respondent involved valuation dates that preceded the abrogation of the *General Utilities* doctrine. The Court found even the respondent acknowledged that irrespective of whether a liquidation of the corporation or a sale of its assets was contemplated on the valuation date, "some reduction in value would be appropriate if, in fact, avoidance of a corporate level gains tax was not available." *Id.* (quotations omitted). The Court stated:

We are convinced on the record in this case, and we find, that, even though no liquidation of [the corporation] or sale of its assets was planned or contemplated on the valuation date, a hypothetical willing seller and a hypothetical willing buyer would not have agreed on that date on a price for each of the blocks of stock in question that took no account of [the corporation's] built-in capital gains tax. We are also persuaded on that record, and we find, that such a willing seller and such a willing buyer of each of the two blocks of [the corporation's] stock at issue would have agreed on a price on the valuation date at which each such block would have changed hands that was less than the price that they would have agreed upon if there had been no ... built-in capital gains tax as of that date.... We have found nothing in the ... cases on which respondent relies that requires us, as a matter of law, to alter our view....

*Id.* at K–19 (citations omitted). The Court allowed a discount for the built-in capital gains tax because "that is what a hypothetical willing seller and a hypothetical willing buyer would have done." *Id.* at K–20.[15]

Further, we believe, contrary to the opinion of the Tax Court, since the *General Utilities* doctrine has been revoked by statute, a tax liability upon liquidation or sale for built-in capital gains is not too speculative in this case. Courts previously have allowed discounts for built-in capital gains if, among other factors, payment of tax on a capital gain is likely. *See, e.g., Obermer v. United States,* 238 F.Supp. 29, 34–36 (D.Haw.1964) (finding expert testimony showed built-in capital gains tax would necessarily adversely

15. An example set forth in Bittker also illustrates this point. In the example, A owns 100% of the stock of X corporation, which owns one asset, a machine with a value of $1,000 and a basis of $200. Bittker assumes a 25% tax rate and points out that if X sells the machine to Z for $1,000, X will pay tax of $200 on the $800 gain. Bittker adds that if Z buys the stock for $1,000 "on the mistaken theory that the stock is worth the value of the corporate assets," Z will have lost $200 economically "because it paid too much for the stock, failing to account for the built-in tax liability (which can be viewed as the potential tax on disposition of the machine, or as the potential loss from lack of depreciation on $800 [of] basis

that Z will not enjoy)." Bittker, *supra* Note 11, at § 10.41[4]. Because of Z's loss, Bittker concludes, "Z will want to pay only $800 for the stock, in which event A will have effectively 'paid' the $200 built-in gains tax." *Id.* One might conclude from this example that the full amount of the potential capital gains tax should be subtracted from what would otherwise be the fair market value of the real estate. This would not be a correct conclusion. In this case, we are only addressing how potential tax consequences-the capital gains tax may affect the fair market value of the shares of stock appellant gifted to her relatives in contrast to the fair market value of the real estate.

affect value of stock at issue to willing buyer, and in allowing discount, contrasted the facts with *Estate of Cruikshank,* 9 T.C. 162, 1947 WL 28, a case relied on by appellee); *see generally Clark v. United States,* No. 1308, 1309, 1975 WL 610, at *4,*5 (E.D.N.C. May 16, 1975) (stating a well-informed willing buyer of stock in corporation would consider that underlying assets of corporation included inactive investment portfolio that, upon liquidation, would incur substantial capital gains tax liability).

Although the Tax Court in this case held that "the primary reason for disallowing a discount for capital gains taxes in this situation is that the tax liability itself is deemed to be speculative," *Eisenberg,* 74 T.C.M. (CCH) at 1048, we disagree. We believe that an adjustment for potential capital gains tax liabilities should be taken into account in valuing the stock at issue in the closely held C corporation even though no liquidation or sale of the Corporation or its assets was planned at the time of the gift of the stock. We therefore remand this matter to the Tax Court to ascertain the gift tax to be paid by the taxpayer consistent with this opinion.[16]

## CONCLUSION

For the reasons stated above, we vacate the order and decision of the Tax Court granting respondent's motion for summary judgment and denying petitioner's motion for summary judgment and remand this case to the Tax Court to determine the gift tax liability of the appellant-taxpayer consistent with this opinion. A.A.B.C.A.B.

---

**16.** Where there is a relatively sizable number of potential buyers who can avoid or defer the tax, the fair market value of the shares might well approach the pre-tax market value of the real estate. Potential buyers who could avoid or defer the tax would compete to purchase the shares, albeit in a market that would include similar real estate that was not owned by a corporation. However, where the number of potential buyers who can avoid or defer the tax is small, the fair market value of the shares might be only slightly above the value of the real estate net of taxes. In any event, all of these circumstances should be determined as a question of valuation for tax purposes.