Raymond J. MARTIN, et al., Plaintiffs

v.

MARTIN BROS. CONTAINER & TIMBER PRODUCTS CORP., et al., Defendants

No. 3:00CV7642.

United States District Court, N.D. Ohio, Western Division.

Jan. 6, 2003.

David J. Rohrbacher, Rohrbachers Light Cron Zmuda & Trimble, Nicholas J. Cron, Rohrbachers Light Cron Zmuda & Trimble, Toledo, OH, for Plaintiffs.

Cheryl L. Ryan, Greg W. Jones, Timothy Curtis Jochim, Jochim Co., L.P.A., Columbus, OH, for Defendants.

### ORDER

CARR, District Judge.

■ This is a diversity case brought by minority shareholders in the defendant Martin Bros. Container & Timber Products Corporation as a "special proceeding" under § 1701.85(B) of the Ohio Revised Code to determine the fair market value of the plaintiffs' shares in the corporation. Under that provision, the fair cash value of the plaintiffs' shares is the amount that a willing seller under no compulsion to sell would be willing to accept and a willing buyer under no compulsion to sell would be willing to pay for those shares. *Armstrong v. Marathon Oil Co.*, 32 Ohio St.3d 397, 513 N.E.2d 776 (1987) (Syllabus, ¶ 1).

The corporation is family owned and has been in existence since 1909. It makes wirebound containers from hardwood and veneer for transporting large items, such as metal machinery parts. Due to increases in the price of hardwood and other market forces, the company has had operating losses since 1995. Since 1995 the company's assets have declined, through sales, primarily, of securities. The company's working capital has correspondingly decreased by about sixty percent during this period.

On July 19, 2000, the majority shareholders, over the objections of the plaintiffs, merged Martin Bros. Container & Timber Company, an Ohio corporation, into a Tennessee corporation of the same name. Plaintiffs filed this lawsuit within a few months thereafter.

In addition to its plant and equipment, the corporation owns approximately 13,000 acres of undeveloped land northwest of New Orleans, Louisiana, about $2,000,000 in marketable securities, and a leasehold interest in a parcel of real estate in Martin, Tennessee.

Three experts were retained to provide estimates of the value of plaintiffs' shares: one by the plaintiffs, another by the defendants, and a third, at the court's suggestion in an effort to accomplish a settlement, by the parties jointly. All three experts, each of whom submitted a written report and testified at the nonjury trial of this case, agreed that the net asset method of evaluation was appropriate.

The valuations reached by each were:

| | |
|---|---|
| Gregory A. Hendel, plaintiffs' expert: | $7,735,692 |
| Daniel P. Callanan, defendants' expert: | $5,798,523 |
| Jeffrey M. Risius, the joint expert: | $5,579,196 |

The principal disagreements between the experts related to three items: 1) the value of the Louisiana land holdings; 2)

the reduction in value in light of a contingent liability for built-in capital gains; and 3) the discount resulting from the minority character of plaintiffs' shareholdings. There are, as well, disputes about the value of other items of lesser value.

## 1. Louisiana Land

The land is vacant, much of it is marshy or swampy, which limits the extent of prospective development, and the income it generates falls short of covering the annual real estate taxes.

Plaintiffs retained an appraiser who valued the land at $3,250,000 as a fair market value. Defendants retained an appraiser who valued the land at $2,212,720 as a liquidation value and $2,929,000 as a fair market value. There is insufficient evidence in the record to accept the contention that liquidation will be necessary. Thus, the fair market value estimates are more reliable, as defendants appear to concede in their post-trial brief.

Defendants recommend that the land be valued at $3,089,500, the midpoint between the appraisals. Plaintiffs ask that it be valued at $3,250,000 (i.e., in accordance with the estimate of their appraiser). They fail to explain, however, why that valuation should be chosen over the lower fair market value estimate of the defendants' appraiser.

I conclude that the only sensible resolution of this dispute is to accept the defendants' suggestion that I accept the midpoint between the two fair market value appraisals. The Louisiana land, accordingly, has a value of $3,089,500.

## 2. Built-in Capital Gains Tax Liability

██ The parties agree that, were the company's assets to be sold, capital gains tax would have to be paid on the assets' built-in capital gains. They dispute how the amount of such tax is to be computed. Defendants assert that the value of the assets subject to this tax should be reduced by the full amount of the tax, computed as of the valuation date.

Plaintiffs assert that, absent evidence that a sale of some or all the assets is about to occur immediately or within a reasonably short period, the anticipated tax liability should be reduced to present value. In other words, plaintiffs contend that reduction in the value of the assets due to the prospective capital gains tax liability should be less than the full amount of that tax that would be due if the assets were deemed liquidated as of the valuation date.

In *Estate of Pauline Welch v. C.I.R.*, 208 F.3d 213, 2000 WL 263309, *4 (6th Cir. 2000) (Unpublished Disposition), the Sixth Circuit stated that the issue

> is not whether or when the [heirs] will sell, distribute or liquidate the property at issue, but what a hypothetical buyer would take into account in computing fair market value of the stock. We believe it is common business practice and not mere speculation to conclude a hypothetical willing buyer, having reasonable knowledge of the relevant facts, would take some account of the tax consequences of contingent built-in capital gains on the sole asset of the Corporation at issue in making a sound valuation of the property.

(Citing *Eisenberg v. Commissioner,* 155 F.3d 50, 57 (2d Cir.1998)).

In *Welch* the court rejected the contention, similar to that made by defendants here, that the entire amount of the built-in capital gains liability was automatically to be deducted from the value of the shares at issue. Instead, the court stated,

> The proper approach in cases of this nature is not to deduct the built-in capital gains tax from the value of the appreciated real estate—as petitioners

sought to do in the present case—because the question is not what is the value of the real estate, but what is the value of the stock with regard to all the circumstances, including the built-in potential capital gains liability if and when the real estate is sold.

*Id.*

Some deduction is, however, to be made against the value of the asset

because a willing seller and a willing buyer of the stock on the valuation date "would have agreed on a price on the valuation date at which each such block [of stock] would have changed hands that was less than the price that they would have agreed upon if there had been no ... built-in capital gains tax as of that date."

*Id.* at *5, 208 F.3d 213 (citing *Davis v. Commissioner,* 110 T.C. 530, 1998 WL 345523 (1998)).

In *Welch* the court, noting that " 'valuation is necessarily an approximation and a matter of judgment, rather than of mathematics,'" *id.* (citing *Davis*), placed the burden of proof on the party (in that estate tax case, the taxpayer) seeking to benefit from the reduction in value of the asset at issue. *Id.* Taking that approach in this case, I conclude that the defendants should bear the burden of proving how much of the anticipated built-in capital gains tax liability is presently to be applied against the value of the company's assets.

The parties' dispute about the impact of the anticipated capital gains tax liability is bottomed on their differing views about when that liability is likely to accrue. Plaintiffs' expert assumes that it will not accrue for thirty years; defendants' expert and the joint expert assume that it will accrue immediately. Each view is extreme, and neither is persuasive.

There is no reason to believe that this company, driven by dissension among its shareholders, producing a product that is likely to become less, rather than more competitive, possessing only one class of assets (marketable securities) that has any perceptible chance of appreciating significantly with the passage of time, and led by a man in his mid-sixties, is likely to last for thirty years. On the other hand, the likelihood that the company's affairs will be wound up shortly after issuance of this opinion is also unlikely. Nothing in the record manifests any intention or expectation on the part of the majority shareholders that the company is soon to be wound up and have its assets sold off. I agree with the defendants, moreover, that the tax-reduction or avoidance tactics referenced by the plaintiffs' expert (i.e., conversion from a C to an S corporation) are not a realistic means of getting out from underneath, or even significantly reducing, the built-in capital gains tax liability.

On the other hand, the operating asset, the container factory, has lost money consistently since 1995. It has been kept going in the face of increasingly severe market conditions by dissipation of other assets. Peter can be robbed to pay Paul for only so long until there is nothing left for one to take from the other.

I conclude, accordingly, that it is more likely than not that the company will be out of business, at the latest, by December 31, 2007. I also conclude that it is more likely than not that the Louisiana land will be sold, at the latest, by December 31, 2012. In the interim, it is also more likely than not that other assets (the securities) will be sold to keep the company going for the next five years at the same rate that they have been sold since 1995, and that when the land is sold, the remaining securities will be sold and the proceeds and whatever else remains of the company's

assets will be distributed to the shareholders.

I conclude, accordingly, that the built-in capital gains tax liability is to be computed on the basis of the present value of that liability as of the valuation date of July 18, 2000 (the day before the merger of Martin Bros. Ohio into Martin Bros. Tennessee).

### 3. Discount for Lack of Control and Marketability

The parties agree that the value of plaintiffs' shares is affected by their minority status. As a result of that status, they cannot control the fate and fortunes of the company. Because of closed, family-held nature of the business, there is no open and ready market for the shares, which makes them less liquid, and otherwise less attractive to a prospective purchaser.

Lacking any other reliable and potentially unbiased guidance, I accept the valuation of these discounts proposed by the joint expert: namely, fifteen percent for lack of control, and thirty percent for lack of marketability.

### 4. Other Disputed Items

With regard to the parties' dispute about other items, I conclude, in light of the experts' reports and their testimony, that the opinion of the joint expert as to those items (the leasehold interest, the company's personal property, and deferred compensation) is the most reliable. It is, accordingly, adopted as more likely than not accurately expressing the value properly accorded to those items.

### Conclusion

Rather than attempting to compute the value of the plaintiffs' shareholdings in light of the foregoing, I shall direct them to prepare and submit a revised statement of valuation, to which the defendants can respond, if they do not agree with plaintiffs' revision, and to which, in turn, the

plaintiffs can reply. At that point this matter will be ready for entry of judgment.

It is, therefore,

ORDERED THAT on or before January 15, 2003, the plaintiffs shall, in light of the foregoing findings and conclusions, file a revised statement of valuation; if the defendants dispute plaintiffs' revised valuation, they shall file a response on or before January 24, 2003; plaintiffs to reply on or before January 31, 2003.

So ordered.