**LARCHFIELD CORPORATION,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 18, Docket 30068.

United States Court of Appeals
Second Circuit.

Argued Nov. 3, 1966.

Decided Dec. 20, 1966.

Murray I. Gurfein, New York City (Goldstein, Judd & Gurfein, New York City) (Silverson, Gelberg & Kronovet, New York City) (Saul Duff Kronovet, Ronald Dreier, William J. Howard, New York City, of counsel), for appellant.

Edward Heilbronner, Alexandria, Va. (Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attys., Washington, D. C.) Jon O. Newman, U. S. Atty., John F. Mulcahy, Jr., Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, SMITH and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

The plaintiff, Larchfield Corporation, is the successor in interest to two corporations both known as The Aspinook Corporation. The older of these ("Old Aspinook") was organized in 1938; the younger ("New Aspinook") was a consolidation, effectuated December 18, 1948, of Old Aspinook and two 50% owned subsidiaries, The Lawrence Print Works, Inc. and Arnold Print Works, Inc., pursuant to the settlement of a stockholders' derivative action in the Supreme Court of New York.

In this suit, begun in the District Court for Connecticut in 1961, Larchfield sought to recover from the United States $271,479 allegedly overpaid as income taxes for the fiscal year of Old Aspinook ending December 17, 1948, and the fiscal years of New Aspinook ending June 30, 1949 and 1950, with interest from the various dates of payment. The claimed overpayments fell into two categories. One related to New Aspinook's reporting as income in its 1949 tax return $259,300 of bonuses paid in previous years to the controlling stockholder of Old Aspinook, Bernard R. Armour, which were recovered as the result of the derivative action (hereafter "the bonus issue"). The other concerned the deductibility of legal, accounting and other fees and expenses relating to that action (hereafter "the fee deduction issue"). The Government's amended answer asserted by way of set-off or recoupment that deductions for legal and other professional fees totalling $152,515 had been allowed in error.

Although the complaint in the derivative action alleged five causes of action, apparently only three were pressed. One of these asserted that Armour and other directors and officers of Old Aspinook had received illegal and excessive bonuses, a second claimed that Armour had improperly caused Old Aspinook to make a gift to him of 500 of the 1000 shares of Lawrence, and a third claimed that Armour had caused Old Aspinook to sell him 500 of the 1000 shares of Arnold for the nominal sum of $500 when their value was at least $500,000. Protracted negotiations led to the execution of a stipulation of settlement on June 4, 1948. This provided for the consolidation of Old Aspinook, Lawrence and Arnold into

New Aspinook on a basis whereby New Aspinook would issue 4 shares for each share of Old Aspinook, 524 shares for each share of Lawrence, and 252 shares for each share of Arnold, and Armour agreed to surrender 102,000 of the shares that would have been so issuable to him.[1]

The New York court referred the propriety of the settlement to J. Edward Lumbard as referee. After hearing testimony on five days and receiving numerous exhibits including examinations before trial, the referee rendered a thorough report finding the settlement to be fair. He was of the opinion that a court would not sustain the claim as to Lawrence since the opportunity had been offered to Old Aspinook, it was not then in a position to utilize this without Armour's help, and the opportunity was fairly divided. On the other hand he concluded there was "a strong likelihood that if the action were tried the trial court would impress upon Armour's 500 shares of Arnold stock a trust for the benefit of Aspinook and would compel Armour to return such stock to Aspinook." His views as to the bonus claims were less decisive. He criticized the bonus plans as "marked with an informality not consistent with good corporate procedure" and as being "only a cursory and perfunctory approval of what one or several directors proposed," and noted that the Old Aspinook and Arnold plans and possibly the Lawrence plan were voidable on the further ground that their adoption depended on the votes of interested directors or persons they dominated. Despite this he was confident the plaintiffs would not succeed as to any of the bonuses save those to Armour since these were paid to full time employees and did not appear excessive. Recognizing the existence of "a real question" as to Armour, who had performed valuable services for Aspinook and had been designated "consultant and adviser" but was under no contractual obligation to the corporation and was interested in fifteen to twenty others, he still thought it was "unlikely that a court, on the trial of this suit, would hold that the amounts paid to him were so great as to constitute a misuse or waste of corporate funds." Weighing the consideration for the settlement furnished by Armour, in agreeing to relinquish 102,000 shares of the corporation resulting from the consolidation, against his loss if the Arnold count were established, the referee found Armour's contribution to be $940,699 versus a loss of $2,339,540 on one basis of valuation, and $1,025,495 versus $1,716,442 on another.[2] On November 10, 1948, the Supreme Court entered an order confirming the referee's report in all respects, directing the settlement to be consummated, and ordering New Aspinook to pay amounts totalling $355,693 for the services and disbursements of the at-

---

1. Armour's stockholdings and the New Aspinook stock that would have been issuable in respect thereof were as follows:

|  | Before Consolidation | After Consolidation |
| --- | --- | --- |
| Old Aspinook | 56,052 | 224,208 |
| Lawrence | 500 | 262,000 |
| Arnold | 500 | 126,000 |
|  |  | 612,208 |
| Of these he was to surrender |  | 102,000 |
| leaving him with holdings in New Aspinook of |  | 510,208 |

The other stockholders, who had held 122,138 shares of Old Aspinook, received 448,552 shares of New Aspinook. Armour's ownership changed from 31.6% in Old Aspinook plus 50% of Lawrence and 50% of Arnold to 51.08% in New Aspinook.

2. The referee noted that Armour was also waiving bonus payments of $266,000 for 1947 and 1948 which he "would have been entitled to and which he probably would have received but for this litigation."

torneys and accountants for the plaintiffs and of the referee.

The consolidation was carried out on December 18, 1948, and the amounts directed by the court were paid. In addition, during its 1949 and 1950 fiscal years, New Aspinook paid further amounts for fees and expenses arising out of the derivative action, some for services to Old Aspinook and other corporate defendants, and some to counsel for individual defendants under a by-law requiring it to indemnify a director against expenses incurred in the defense of any action in which he was made a party by reason of his office unless he were adjudged liable for negligence or misconduct.[3] All these latter amounts were taken as deductions. New Aspinook also deducted 25.6119% of the fees and expenses of the plaintiffs' lawyers and accountants and the referee, this being the ratio of Armour's paid bonuses ($259,300), recovery of which it reported as income, and waived bonuses ($266,-000) to the value of the 102,000 shares surrendered in the settlement (taken for this purpose to be $1,785,000) plus the waived bonuses. In this suit Larchfield claimed that the bonuses should not have been reported as income and that all amounts expended by it for attorneys' and other fees were deductible and sought recovery of the tax on the $259,-300 of bonuses and on the excess of the fees and expenses over $162,515 already allowed; the Government, as indicated, alleged that most of the allowances previously made were in error.

On a motion for partial summary judgment on the fee deduction issue, Judge Anderson, in March 1962, ruled largely in the Government's favor, 203 F.Supp. 821. He considered that "the principal purpose of the New York Su-preme Court case was to restore title to the Arnold shares to Old Aspinook"; that all amounts expended in behalf of Armour and Old Aspinook in effecting a settlement of the claims pertaining to Armour's acquisition of that stock must be deemed a capital expenditure within Levitt & Sons v. Nunan, 142 F.2d 795 (2 Cir. 1944), after remand, 160 F.2d 209 (2 Cir. 1947), despite Hochschild v. CIR, 161 F.2d 817 (2 Cir. 1947); that, on the other hand, some of the amounts related to other issues, notably the bonuses and the Lawrence stock, and were deductible business expenses; and that all the fees and expenses should be allocated on that basis. In response to his direction that the parties seek agreement as to an allocation conforming to his opinion, they stipulated that $221,000 was deductible on the principles set forth by Judge Anderson, this resulting in an additional deduction of $58,485. After trial of the bonus issue late in 1964, Judge Clarie found that Larchfield had not produced evidence sufficient to meet its burden of proof and overcome the admission in its return that the settlement had produced income of $259,300 representing "Recovery of compensation previously paid." 243 F. Supp. 926. Judgment was entered for the sum resulting from the stipulation reflecting Judge Anderson's opinion on the fee deduction issue, plus interest. Plaintiff alone appeals, claiming that Judge Clarie's findings were clearly erroneous and that Judge Anderson's failure to allow all the amounts expended for professional services is inconsistent with Hochschild v. CIR, supra, which it considers to have established a general principle that all amounts reasonably expended in connection with an action charging a director with breach of fiduciary duty are deductible.

3. According to a stipulation of fact, $39,-422 was paid to counsel and accountants for Old Aspinook and other corporate defendants and $87,069 to counsel for individual defendants. Also in its last taxable period Old Aspinook paid an individual $5000 for services in effecting the settlement. Addition of these sums to the $355,963 directed to be paid to plaintiffs' attorneys and accountants and the referee produces a total of $487,184. Another $25,000 was paid by Old Aspinook in 1948 for professional services, thus bringing the total to $512,184.

## I. *The bonus issue.*

Larchfield contends the entry in its 1949 income tax return was an error to which it should not be held. Relying heavily on the referee's report in the state court action to show that nothing was recovered in respect of the bonuses, it argues that this was conclusively proved by the testimony of attorney Joseph R. Kelley. Although Kelley's firm was counsel for the corporations in the derivative action, he had also represented some individual defendants—indeed, was "the coordinator for the defense and the attorney upon whom the brunt of the defense fell"—and had negotiated the settlement with the chief counsel for the plaintiffs on behalf of all the defendants, including Armour; he testified that defense counsel considered the bonus issue to have "no substance," and that there was "utterly no relationship" between it and the 102,000 shares waived by Armour. Larchfield points also to the incongruity of considering that a settlement which the referee computed as affording a recovery of only 40% to 60% on the best cause of action alone could have provided a 100% recovery on a weaker one, with correspondingly less on the stronger claim—indeed considerably more than a 100% recovery if the amount by which the bonuses to Armour were excessive constituted old Aspinook's maximum entitlement. It argues, therefore, in the alternative that if any recovery of bonuses was effected, this would be only a portion of the $940,000 said to have been contributed by Armour which would equal the ratio of his bonuses to the total amount at stake in the litigation.

The record demonstrates, however, that the reporting of the $259,300 as income was in no sense an inadvertent error but was a thoroughly considered and motivated decision, stemming largely from a lawyer hired by Armour to look after his interests as well as the corporation's. About a month after signature of the stipulation of settlement, Armour retained a new attorney, Leonard B. Frutkin, "partially" to give tax advice.

Efforts by the Government to find out what he did were largely blocked by a barrage of objections on the score of the attorney-client privilege by counsel for Larchfield and also by Frutkin on behalf of Armour's estate which had declined to waive the privilege. The scraps the Government was able to elicit and place in evidence shows that Frutkin conferred or corresponded repeatedly with Armour, with Kelley and others in his firm who were representing both the corporation and Armour, with Thomas F. Daly of Lord, Day & Lord, counsel for Armour, and with Kumblad or Johnston of Scovell, Wellington & Co., accountants for the company and, according to Frutkin, "to some extent, at least" for Armour personally. In January 1949 Armour sent Frutkin a letter enclosing "a copy of what is now the conclusion of all the attorneys, and accountants, in connection with my income tax situation in the Aspinook Corporation matter," with a request that Frutkin confer with him. Later, in justifying a bill to New Aspinook for $5000 for his services in addition to $7500 paid by Armour, Frutkin quoted a letter from Armour in January 1949 to the corporation's attorneys stating that Frutkin was acting "in order that proper tax forms be filed with the Government as far as Aspinook and myself are concerned * * *." He listed as one of his achievements the development of "the view in which all other interested parties concurred after reconsideration of prior plan, that since a part of the 102,000 shares surrendered to the Corporation represented restitution of bonuses, it was advisable, from the Corporation's point of view, without regard to incidental benefits to Mr. Armour, in order to obviate later question and probable litigation concerning the tax treatment of the settlement, that a reasonable portion of the value of the 102,000 shares surrendered to the Corporation be allocated to the bonus claims. As a result, approximately $250,000 was thus allocated."

The decisive character of Frutkin's intervention was made clear by the testi-

mony of Johnston, the partner in charge of the tax department in the Scovell Wellington office at Springfield, Mass., who admitted responsibility for the decision to report the bonuses as income. He had begun with a clear conviction that Armour had simply returned something to which he never had proper title and there was no connection between that and the bonus issue. However, when shown a letter from Armour referring to some advice from a tax specialist, namely Frutkin, "as to the possibility or probability that some recovery had been made of these bonuses," he changed his mind and "after consultation with Mr. Kelley" decided the best thing to do was to report the full amount so that "there couldn't be any criticism on the part of the Government," and later file a claim for refund. Evidently the decision was sufficiently surprising to Norcross, then a staff man who was reviewing the return in the Scovell Wellington tax department at Springfield, that he telephoned Kumblad, a senior partner in New York, to make sure this was really intended. Norcross confirmed to Kumblad in a memorandum of the conversation that "The position which you wish us to take is that, through the relinquishment of the shares, the new company made a recovery of the prior year's [sic] bonuses in the amount of $259,-299.65, and that this sum should be included in income for the period ended June 30, 1949."

Larchfield errs in assuming that the issue here is the same as if it had reported no income, the Commissioner had claimed a deficiency in the full amount of the bonuses, and it had then challenged him in the Tax Court. In that event the only question would be whether the bonuses had been recovered, and there would seemingly be much merit in the position that, at minimum, not all of them had been. But when the suit is to recover taxes voluntarily paid, a plaintiff must show that the Government is holding money it cannot justly retain. Such an action, as Lord Mansfield said in the famous case of Moses v. Macferlan, 2 Burr. 1005, 1010, 97 Eng.Rep. 676, 679 (1760), which this court applied to a refund suit in United States Paper Exports Ass'n v. Bowers, 80 F.2d 82, 84–85 (2 Cir. 1935), "is the most favorable way in which he [the defendant] can be sued," since he "may defend himself by everything which shows that the plaintiff, *ex aequo et bono*, is not intitled to the whole of his demand, or to any part of it." See also Crocker v. Malley, 249 U.S. 223, 235, 39 S.Ct. 270, 63 L.Ed. 573 (1919); Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265 (1937); Rockwood v. United States, 38 F.2d 707, 710 (Ct.Cl. 1930); Mahoning Investment Co. v. United States, 3 F.Supp. 622 (Ct.Cl.), cert. denied, 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064 (1934); Wilson & Co. v. United States, 15 F.Supp. 332 (Ct.Cl. 1935); Ryan v. Alexander, 118 F.2d 744, 748 (10 Cir.), cert. denied, 314 U.S. 622, 62 S.Ct. 72, 86 L.Ed. 500 (1941). Contrast Schlemmer v. United States, 94 F.2d 77 (2 Cir. 1938). Larchfield's tax return was an admission of the recovery of the bonuses in the fiscal year 1949, Campagna v. United States, 290 F.2d 682, 684 (2 Cir. 1961), which it made no attempt to withdraw until December 1957, eight years after Armour's death. Even now it points to no grounds of fact or law with respect to the bonuses which were not equally known when, after full consideration, New Aspinook filed its 1949 return as it did; Kelley made no attempt to reconcile his present clear belief that the settlement reflected nothing in the way of recovery of bonuses with his acquiescence in the filing of a tax return showing a total recovery of them. We know from Frutkin's letter that the choice had the "incidental" effect of benefiting Armour. Whether the benefit was the most obvious one of deductions going back to 1941 for the bonuses now reported as returned, or something else, the record does not tell. Larchfield has not advanced any intelligible reason other than such benefit for reporting the bonuses—particularly for reporting all of

them—as recovered. Elementary arithmetic suffices to show that any benefit to the corporation from including the $259,300 in the numerator of the fraction used to allocate the fees paid the plaintiffs' attorneys and accountants and the referee was less than the burden of reporting the entire sum as income; and any accountant of Johnston's experience would have known that criticism on the score of concealment could have been avoided by not reporting the bonuses as income but disclosing them and stating why they had not been reported. Why Government counsel did not go further in showing what benefits Armour had realized or at least in accounting for their inability to do this after so many years, we indeed cannot understand. But what was proved sufficed to require Larchfield to come forward with more evidence than it did to show that the Government would be unjustly enriched by retaining what Larchfield voluntarily paid. Our conscience is no more moved to allow Larchfield to depart from its considered choice at this late date than was the district judge's.[4]

## II. *The fee deduction issue.*

The legal setting for the fee deduction issue is familiar. Section 23(a) (1) (A) of the 1939 Code allows deduction of "[a]ll the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," but § 29.24–2 of Treasury Regulations 111 provides "The cost of defending or perfecting title to property constitutes a part of the cost of the property and is not a deductible expense." The regulation, which accords with the principle of § 24(a) (2) and (3) of the 1939 Code, dates back to 1916; this court said in Levitt & Sons v. Nunan, 142 F.2d 795, 797 (2 Cir. 1944), "There can be no question of its validity, and

the courts have applied it in a number of instances to situations in which a taxpayer has either settled a claim to property in his possession, or paid the expenses of defending it." The difficulty arises from many other cases, barely if at all distinguishable, where the courts have *not* applied it on the very matter of legal and other professional fees here at issue. As we recently noted, in something of an understatement, "The drawing of this line has not been easy, as is demonstrated by the many cases cited in 4 Mertens, Law of Federal Income Taxation, §§ 25A.14, 25A.15 and 25A.16 (1960 ed.), and in the discussion of the corresponding problem under the business expense section, see ibid. §§ 25.20, 25.24, 25.25, 25.26 * * *." Petschek v. United States, 335 F.2d 734, 736 (2 Cir. 1964); see also CIR v. Doering, 335 F.2d 738 (2 Cir. 1964).

Larchfield's argument that all the fees and expenses in connection with the derivative action were deductible stems from a well-known decision of this court refusing to apply the regulation, although a powerful dissent by Judge Frank contended that it barred part of the claimed deduction of legal fees. Hochschild v. CIR, 161 F.2d 817 (2 Cir. 1947). Larchfield takes the case as establishing that despite the regulation all expenditures in connection with litigation for breach of fiduciary duty by a director are deductible, apparently on the theory that this must be the "dominant purpose" of any suit against a director since a money judgment would do the job as well as the recovery of specific property, or, perhaps more persuasively, that the deductibility of attorneys' fees should not depend on what may be a capricious choice of remedy on the part of a plaintiff. It contends this view of the law is confirmed by the Commission-

---

4. There is no merit in Larchfield's contention that income, if any, was realized by Old Aspinook rather than New Aspinook since the time to appeal from the order of the New York Supreme Court directing the settlement expired on December 10, 1948 and New Aspinook did not come into being until the statutory consolida-

tion on December 18. Apart from the fact that this was the date when Armour surrendered the 102,000 shares, the cases cited in the text would bar a refund claim by plaintiff long after the time for an assessment against Old Aspinook had expired.

er's acquiescence in three Tax Court decisions, Charles K. Bishop, 25 T.C. 969 (1956), acq. 1956–1 C.B. 3; Shoe Corp. of America, 29 T.C. 297 (1957), acq. 1958–1 C.B. 6; and B. T. Harris Corp., 30 T.C. 635 (1958), acq. 1958–2 C.B. 5.

The three Tax Court cases and the Commissioner's acquiescence in them do not establish any such general rule. *Bishop* involved a suit treated by the Tax Court as one to recover income claimed to have been diverted from the corporation and not as one to recover specific property. In *Shoe Corp.*, the derivative suit had succeeded in enjoining the transaction challenged before the new stock had gotten into the directors' hands. In *Harris Corp.*, the property recovered was money paid and the corporation's own stock issued as salary, and the return of these items presumably resulted in income to the corporation.

While the argument based on *Hochschild* is more appealing, acceptance of it would carry us too far. The rule which plaintiff would extrapolate from that decision obviously could not be limited to derivative actions but would apply equally to suits brought by the corporation itself. There would likewise seem to be no tenable basis for distinguishing between an action against a director for the recovery of specific property and a similar one against a trustee or other fiduciary. Having gone so far we would find the gravest difficulty in distinguishing between such actions and those to enforce other equitable claims, e. g., for the recovery of property whose sale was induced by fraud or even for specific performance of a contract to purchase land. Yet to hold expenses in all such actions to be deductible would be in the teeth of the regulation and would place us in conflict with many decisions, of which it here suffices to cite as examples Munson v. McGinnes, 283 F.2d 333 (3 Cir. 1960); Spangler v. CIR, 323 F.2d 913 (9 Cir. 1963); and Iowa Southern Utilities Co. v. CIR, 333 F.2d 382 (8 Cir.), cert. denied, 379 U.S. 946, 85 S.Ct. 438, 13 L.Ed.2d 543 (1964).

■ Even if we look only to our own decisions to hold that the expenses of a suit against directors are always deductible would fly in the face of Levitt & Sons v. Nunan, supra, 160 F.2d 209 (after remand). The majority in *Hochschild* did not intend to overrule *Levitt*, then very recently decided; on the contrary, they referred to the first opinion in *Levitt* as "in further support of our conclusion that these fees are not in any real sense capital expenditures." The only portion of that opinion that would support the conclusion of the majority in *Hochschild* in favor of deductibility was the holding that if the corporation had settled solely because of the adverse effect of the suit on its business generally, the deduction should be allowed. The majority may thus have thought that, in view of the wholly successful outcome, Hochschild never regarded his title to the Climax stock as being really in peril. And Wise v. CIR, 311 F.2d 743 (2 Cir. 1963), while distinguishable from the instant case, is at least a datum that where *Levitt* and *Hochschild* exercise conflicting pulls, *Levitt's* is by no means inferior. Here it seems to us, as it did to Judge Anderson, that the real thrust of the count as to Arnold was the recovery or the impressing of a trust on the 500 Arnold shares held by Armour, and that in consequence payment of plaintiffs' expenses was capital in nature insofar as they were directed to that end. To the argument that the plaintiffs could have done as well by suing Armour for damages, our sole but sufficient answer is that we look at what they did rather than at what they might have done.

On the other hand, we wholly approve of Judge Anderson's ruling, from which the Government has not appealed, that insofar as the derivative action had objectives other than the recovery of specific property, the plaintiffs' fees and expenses and the costs of the reference were deductible and that an al-

location was demanded. Indeed, we believe that, for reasons not argued by it, Larchfield may be entitled to a larger allowance than Judge Anderson made. This is because we see no sufficient basis for the assumption, apparently entertained by both parties and consequently accepted by him, that the considerations determining the deductibility of the sums the corporation was ordered to pay to counsel and accountants for the plaintiffs in the derivative action and to the referee also govern the fees and expenses incurred on behalf of itself and its subsidiaries and the amounts paid to counsel for the individual defendants under the indemnification by-law.

■ So far as we can determine, Old Aspinook and the subsidiaries took no position in the litigation but observed an attitude of neutrality, see 2 Hornstein, Corporation Law and Practice § 714 p. 201. They were nevertheless represented, as they had to be. The deductibility of expenses to that end would be rather clear if the suit had been unsuccessful, since the corporations were not endeavoring to perfect title, and they would have perfected none. We see no sufficient reason why plaintiffs' partial success should work a change. It is still true that the bills that Old Aspinook and the subsidiaries paid for its own counsel and accountants were not for services in an endeavor either to perfect or to defend title to property but rather in the "ordinary and necessary" activity of being properly represented in an action in which the corporations took no position.

■ We think also that the amounts paid by Old Aspinook to counsel for individual defendants under the indemnification by-law were fully deductible. It is true that, under the view taken by Judge Anderson with which we agree, so much of the fees of Armour's attorneys as related to defense of his title to the Arnold stock would not have been deductible if paid by him but would be an addition to the basis for the New Aspinook stock which these services enabled him to retain free of any further

claim. But it does not follow that the payments had the same character for tax purposes when made by the corporation under a pre-existing contract requiring it to indemnify him. Payment of legal fees under such a by-law has been reasonably characterized as "a fringe benefit necessary to induce officers and directors to serve, deductible in any event to the corporation as reasonable compensation." See McDonald, Deduction of Attorneys' Fees for Federal Income Tax Purposes, 103 U.Pa.L.Rev. 168, 191–92 (1954) and cases there cited.

In this instance also the deductibility of the payments would have been clear enough if the stockholders' action had failed; we would see no warrant for withholding a deduction from the corporation simply because stockholders had asserted, without sufficient grounds, that it had title to property held by a director, as to which the corporation remained silent. To be sure the expenses paid by the corporation would have assisted the director in defending his title, but that is not what the regulation means. Neither do we perceive why the plaintiffs' success should change this; the payments to the defendants' lawyers were not made in an effort by the corporation to perfect title but rather under a contract obligating it to pay for efforts to defeat the claim being made on its own behalf. If analysis is advanced by the explanation that perfection of the corporation's title is not "proximately" brought about by expenditures to preserve its neutrality or to assist those opposing, cf. Bingham's Trust v. CIR, 325 U.S. 365, 374, 376, 65 S.Ct. 1232, 89 L.Ed. 1670 (1945), we can use the adverb with a good conscience.

It follows that all the fees and expenses were deductible, except for the proportion fairly attributable to the recovery of the Arnold shares and this exception would include only the portion of the fees and expenses of the plaintiffs' lawyers and accountants and of the reference which has been determined by the district court to be nondeductible, a similar proportion of the $5000 fee for negoti-

ating the settlement, see fn. 3, and any part of the sums paid to the corporations' lawyers and accountants which was for consummating the settlement as distinguished from representing the corporations in a neutral capacity. The judgment is modified to the extent indicated and as so modified is affirmed. We suggest that the parties seek agreement on dollar amounts that will reflect the conclusions in this opinion; if they cannot agree, these will be fixed as the district court may direct.