**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SARA FLOYD POWELL,
Plaintiff-Appellee,

v.

JOHN F. FLOYD; GORDON FARMS,
INCORPORATED; MULLIKAN VAULT
COMPANY,                                               No. 97-2686
Defendants-Appellants,

and

RICHARD GORDON FLOYD; LOUISE
CAMPBELL,
Intervenors-Defendants.

SARA FLOYD POWELL,
Plaintiff-Appellant,

v.

JOHN F. FLOYD; GORDON FARMS,
INCORPORATED; MULLIKAN VAULT
COMPANY,                                               No. 97-2748
Defendants-Appellees,

and

RICHARD GORDON FLOYD; LOUISE
CAMPBELL,
Intervenors-Defendants.

SARA FLOYD POWELL,
Plaintiff-Appellee,

v.

JOHN F. FLOYD; GORDON FARMS,
INCORPORATED; MULLIKAN VAULT
COMPANY,                                                          No. 98-1382
Defendants-Appellants,

and

RICHARD GORDON FLOYD; LOUISE
CAMPBELL,
Intervenors-Defendants.

SARA FLOYD POWELL,
Plaintiff-Appellant,

v.

JOHN F. FLOYD; GORDON FARMS,
INCORPORATED; MULLIKAN VAULT
COMPANY,                                                          No. 98-1429
Defendants-Appellees,

and

RICHARD GORDON FLOYD; LOUISE
CAMPBELL,
Intervenors-Defendants.

Appeals from the United States District Court
for the District of South Carolina, at Spartanburg.
William M. Catoe, Jr., Magistrate Judge.
(CA-96-2063-7-20AK)

Argued: May 7, 1999

Decided: October 12, 1999

2

Before MURNAGHAN and LUTTIG, Circuit Judges, and
WILLIAMS, Senior United States District Judge for the Eastern
District of Virginia, sitting by designation.

_____

Affirmed in part and reversed in part by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert L. Widener, MCNAIR LAW FIRM, P.A., Columbia, South Carolina, for Appellants. David Lynn Freeman, WYCHE, BURGESS, FREEMAN & PARHAM, P.A., Greenville, South Carolina, for Appellee. **ON BRIEF:** Charles Porter, Celeste T. Jones, MCNAIR LAW FIRM, P.A., Columbia, South Carolina, for Appellants. Gregory J. English, WYCHE, BURGESS, FREEMAN & PARHAM, P.A., Greenville, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

John Floyd, the majority stockholder in two closely held, family owned corporations, appeals from a judgment ordering him to purchase his sister's (Sarah Floyd Powell's) shares at a price exceeding $2,000,000.[1] Floyd lodges three major objections to the magistrate

_____

[1] Pursuant to a partial settlement agreement, Floyd has paid more than $1,000,000 of the judgment amount, and the parties are now litigating over the remaining money in the instant appeal.

judge's decision:[2] (1) the magistrate judge erred in refusing to allow Floyd to reduce the amount paid to Powell by the amount of money he would owe in capital gains taxes if he had otherwise disposed of the stock; (2) the magistrate judge erred in declining to apply the doctrines of laches and unclean hands; and (3) the magistrate judge erred in awarding Powell her attorney's fees. For her part, Powell raises several challenges, which principally include the refusal to calculate her attorney's fee award and director's fees as expenses to be deducted from the derivative award in determining the taxes on that award.

I.

John Gordon Floyd ("John"), the father of Floyd and Powell, started Gordon Farms, a corporation organized under subchapter C of the Internal Revenue Code,[3] in 1959. John also created Mullikan[4] Vault, a corporation organized under subchapter"S" of the Internal Revenue Code.[5] After John's death in 1969, Floyd, Powell and their brother Richard Floyd ("Richard") each inherited a one-third share of the corporations. In addition to giving the corporations to his children, John's estate created two testamentary trusts for his wife's (Louise Floyd Campbell's) benefit.

In 1976, the family asked Floyd to leave graduate school and manage the corporations. He has managed them ever since. In 1982, Gordon Farms' board of directors[6] decided to pay Floyd a combined compensation package of $70,000. Powell was to receive $15,000 per year in director's fees. That same year, the board approved a $4,000 per month payment to Louise. Louise later resigned from the board.

_____

[2] The parties consented to the disposition of this diversity matter by the magistrate court pursuant to 28 U.S.C. § 636(c)(1) (1994).
[3] <u>See</u> 26 U.S.C. §§ 301-386 (1994).
[4] In some of the corporation's financial statements and internal documents, its name is spelled "Mullikin." However, in the briefs presented to the court, the name is spelled "Mullikan." Throughout the opinion here, we will use the latter spelling.
[5] <u>See</u> 26 U.S.C. §§ 1361-1379 (1994).
[6] Apparently, the same individuals served on Mullikan Vault's board as well.

Powell and Richard, as members of the board of directors, helped Floyd manage the corporations into the early 1990's. In 1992, however, Richard sold his interests to Floyd for $1,140,000. Floyd agreed to repay Richard with annual installment payments of $100,000 for thirty years. As a result of the sale, Floyd owned two-thirds of the stock in each corporation, and Powell owned one-third of the stock.

After John's death, the corporations suffered from mismanagement. In the early 1970's, before Floyd began managing the corporations, Gordon Farms had financial trouble. It borrowed $631,477 from one of the testamentary trusts and still owed that trust more than $585,000 at the beginning of the litigation.

Floyd's tenure as president has been marked by internal disarray. Only one shareholders' meeting has been held since 1987.[7] Many of the records of important votes and transactions are incomplete or non-existent. While the corporations have not become insolvent, the magistrate court found that Mullikan Vault had no value.

Moreover, Floyd often took advantage of his position as president of the corporations. Floyd's salary increased from $70,000 to $90,000 in 1988, although there were neither board meetings held to vote on the matter nor any other sign of approval by the board or shareholders.[8] Similarly, he was paid $140,000 in 1994 and 1996, although there are no records of votes approving the salary increase. Despite his agreement in 1979 to draw no salary from Mullikan Vault, Floyd drew a salary from that corporation in 1995 and 1996. In 1995, Floyd drew $11,677 in salary and $12,000 in management fees. In 1996, he was paid a $28,000 salary. As with his other salary increases, no records show the board's or shareholders' approval.

Floyd also caused the corporations to expend funds for his personal endeavors. In 1977, the board agreed to pay Floyd's membership dues

_____

[7] Powell was elected treasurer at the 1987 meeting. The other meeting took place in January 1993.

[8] Under South Carolina law, the board is not required to hold formal meetings before making decisions, particularly where the directors own all of the stock and are cooperating with each other. See Alderman v. Alderman, 181 S.E. 897, 906 (S.C. 1935).

5

in three local clubs and to provide him with an automobile.**9** However, since 1986, the corporations have paid for far more than that. Gordon Farms' records show that it purchased a vehicle for one of Floyd's sons, made approximately $66,000 in payments on Floyd's yacht, donated several more thousands to charities that Floyd supports, paid for Floyd's medical bills and other miscellaneous expenses. Moreover, Floyd borrowed approximately $440,000 from Gordon Farms. At trial, Floyd could not produce any documentary or other evidence that those expenditures were approved by the board or the shareholders.

In the meantime, Powell had considered suing Floyd several times. She believed that as early as 1990, Floyd was attempting to "squeeze" her out. She thought that Floyd intentionally failed to share important information about the companies' operation with her, such as plans for developing some of Gordon Farms' property. Thus, in 1993, she hired an accountant to perform a comprehensive review of both corporations' records. That review revealed some -- but not all -- of the conduct at issue in the instant litigation. Powell claimed that she chose not to sue immediately out of respect for her family and a desire not to disrupt the family businesses.

Powell then sought to negotiate a settlement with Floyd that would permit her to exit the company. After negotiations failed, she filed the instant lawsuit. She sought dissolution of the corporations, or, alternatively, a buyout of her shares. In particular, Powell sought an arrangement that would give her a portion of the companies' real estate and would not result in any tax liability for her. After a trial held March 31 - April 3, 1997, a magistrate judge concluded that Floyd had breached his fiduciary duties to the corporations and ordered Floyd to reimburse them for his excessive expenditures. The judge also ordered Floyd to buy Powell's shares. The judge then ordered the parties to structure the buyout. On January 21, 1998, after months of contentious negotiations and various motions, the magistrate judge set the buyout at $2,331,675.00. Both parties appeal.

_____

**9** The clubs are the Sertoma Club, the Piedmont Club, and the Country Club of Spartanburg. Gordon Farms' records also show that it purchased a 1994 Ford Explorer for $27,000 for Floyd's use.

6

II.

As the instant case is a diversity matter -- Powell is a North Carolina resident while Floyd and the corporations are South Carolina residents -- the rule of Erie v. Tompkins, 304 U.S. 64, 78 (1938), requires us to apply South Carolina law.

Floyd first complains that the magistrate judge erred in refusing to deduct from the net asset value an amount equal to the amount the corporation would have to pay in capital gains taxes if it were liquidated or otherwise transferred.[10] He contends that because the taxes will eventually have to be paid, any valuation should consider them. He further contends that the changes occurring in the Tax Code in 1986 support such deductions as well. On the other hand, Powell contends that Floyd waived the argument by failing to present it at the initial hearing.

We conclude that Floyd did not waive the argument. While parties generally waive an argument when they fail to raise it in a timely manner, a trial court's exercise of its discretion to hear the argument anyway may preserve it for appellate review. See Holland v. Big River Minerals Corp., ___ F.3d ___, 1999 WL 417472 at *6 (4th Cir. June 23, 1999). Here, the magistrate judge noted that Floyd did not raise this particular tax issue at trial, but considered the argument after the trial. Since the trial court decided to hear Floyd's argument, Floyd has preserved the issue for our review.

That said, Floyd's argument is unavailing. Floyd principally relies on the recent Second Circuit case Eisenberg v. Commissioner of Internal Revenue, 155 F.3d 50, 53 (2d Cir. 1998). In that case, the sole shareholder in a corporation decided to give her children her shares in that corporation. Before making the gift, Eisenberg deducted the capital gains taxes as they would have been paid if the company were being liquidated or otherwise transferred. See id. at 52. The tax court concluded that the deductions were improper. See id.

---

[10] The issue Floyd raises here is an issue of law, which we review de novo. See St. Paul Fire & Marine Ins. Co. , 86 F.3d 332, 334 (4th Cir. 1996).

7

However, the Second Circuit reversed, holding that the rationale for prohibiting that deduction was the General Utilities doctrine, under which C-Corporations were not taxed on unrealized gain.**11** See id. at 54. Congress has abrogated that doctrine. See Tax Reform Act of 1986, Pub. L. No. 99-514, § 631, 100 Stat. 2085, 2269 (codified as amended in scattered sections of 26 U.S.C.). Because of that abrogation, the Second Circuit held that the deduction was appropriate because Eisenberg's corporation no longer could avoid taxation at the corporate level. See Eisenberg, 155 F.3d at 56.

Although Congress has abrogated the General Utilities doctrine, Floyd will not prevail. That Gordon Farms eventually must recognize the gain does not necessarily require that Floyd deduct the taxes before providing a final valuation of Powell's shares. The Eisenberg court noted that gain recognition can be deferred indefinitely where the corporation retains its property and continues leasing it to third parties.**12** See 155 F.3d at 56, n.14. That is precisely what Floyd was attempting to do with the tracts of land Gordon Farms owns. To the extent that the recognition can be deferred, we should not effectively impose the tax burden on Powell.**13**

_____

**11** As the court notes, the Supreme Court held in General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 206 (1935), that corporations did not recognize gains on distributions of appreciated property. See Eisenberg, 155 F.3d at 54. As a result of the holding in General Utilities, courts disapproved corporate attempts to take a capital gains deduction when valuing their shares because corporations could avoid taxation altogether by simply liquidating and distributing their assets. See Eisenberg, 155 F.3d at 54.

**12** Indeed, the corporation at issue in that case also leased its property to third parties. See 155 F.3d at 52. The court simply concluded, without citation to authority, that because the taxes eventually must be paid, they were not sufficiently speculative to avoid consideration. We simply disagree with that assessment where the corporation not only will not be liquidated in the foreseeable future, but also can defer the recognition of the gain indefinitely. Moreover, the particular facts of this case only reinforce that view.

**13** Essentially, the issue here boils down to who will bear the tax burden. That is, our holding simply leaves the tax burden on the corporation to pay when it finally must recognize the gain.

8

Floyd next complains that the magistrate judge should have applied the doctrines of laches and unclean hands to dispose of Powell's claims. He points to Powell's previous complaints about some of the activities at the heart of the instant action as evidence that Powell should have sued earlier than she did. Moreover, he argues that her occasional use of corporate property renders her hands "unclean." Since actions brought under S.C. Code Ann. § 33-14-300 to dissolve corporations are equitable, see McDuffie v. O'Neal, 476 S.E.2d 702, 708 (S.C. App. 1996), equitable doctrines such as those advanced by Floyd may bar Powell's recovery.

Floyd first contends that the laches doctrine should bar Powell's recovery. The laches defense is grounded in the maxim that "[e]quity aids the vigilant, not those who slumber on their rights." Hemingway v. Mention, 89 S.E.2d 369, 372 (S.C. 1955) (citation omitted). It applies where the plaintiff unreasonably delays the pursuit of his or her rights and the defendant is injured or prejudiced thereby. See Gibbs v. Kimbrell, 428 S.E.2d 725, 730 (S.C. App. 1993). It is a fact-sensitive inquiry, and, in South Carolina, is generally left to the trial court's discretion. See id. Likewise, we review the decision to apply the doctrine for an abuse of that discretion. See Skippy, Inc. v. CPC Int'l, Inc., 674 F.2d 209, 212 (4th Cir. 1982).

Although Powell had general awareness of some of the activities giving rise to the claims she asserts, the magistrate judge did not abuse his discretion in declining to apply laches. First, Powell's delay was caused, in some part, by her desire to negotiate an exit from the corporations rather than bring suit. She decided to sue only after the negotiations dissolved. Thus, she was not sleeping on her rights but only trying to protect them without litigation. Second, in addition to the instances of self-dealing Powell learned about through the 1993 audit, Floyd engaged in other wrongful practices that Powell knew nothing about until the instant litigation. For example, Powell's 1993 audit would not have revealed the salaries Floyd drew from Mullikan Vault in 1995 and 1996, the plans for development in 1995 that Powell learned about through newspaper accounts well after the negotiations or the extent to which Floyd used corporate funds to supply his children with cars and other amenities. As a result, we cannot conclude that Powell unreasonably delayed filing her claims.

9

Even if Powell did delay in filing her claims, the laches defense still does not bar them here. Delay alone is insufficient to prevail on a laches defense. See Gibbs v. Kimbrell, 428 S.E.2d 725, 730 (S.C. App. 1993). Rather, the defendant must suffer some prejudice in order to bar the plaintiff's claim. See id. A defendant has not been prejudiced by the delay if the delay merely has permitted him to enjoy a wrongfully obtained benefit for a longer period of time. See Provident Life and Accident Ins. Co. v. Driver, 451 S.E.2d 924, 929 (S.C. App. 1994). Here, the only "prejudice" to Floyd was that he continued to misuse corporate funds for his benefit for a longer period of time. Because that is insufficient injury to constitute prejudice, the laches defense does not apply.

Floyd's unclean hands argument is unavailing and merits little discussion. That doctrine is rooted in the time-honored maxim that "he who seeks equity should come with clean hands." See Hemingway v. Mention, 89 S.E. 2d 369, 372 (S.C. 1955). Thus, a plaintiff who has engaged in wrongdoing or impropriety in the transaction giving rise to the litigation cannot avail herself of equitable relief. See Wilson v. Landstrom, 315 S.E.2d 130, 134 (S.C. App. 1984).

The magistrate judge did not err in refusing to preclude Powell from obtaining relief. The record shows that any misappropriations on Powell's part were minor in scope. For example, Floyd complains that Powell approved some of the political donations and even helped make one of them. The record shows that she did approve of one such donation. Proof of approval of a single political donation is insufficient to establish that she approved of all such donations made. We must remember that as a general matter, the defendant seeking application of the unclean hands doctrine must demonstrate that he has been injured by the plaintiff's conduct. See Arnold v. City of Spartanburg, 23 S.E.2d 735, 738 (S.C. 1943). In light of the conduct Floyd complains of, no such demonstration has been made here.

At any rate, Floyd is in no position to complain about unclean hands. The law clearly requires that the matter to which defendant seeks to apply the unclean hands doctrine must be one about which "he can in good conscience complain in equity." Arnold, 23 S.E.2d at 738. The magistrate judge's factual findings detail Floyd's consistent and pervasive abuse of the corporations. Phone calls and political

10

donations are the least of those indiscretions. In other words, Floyd cannot "in good conscience complain in equity" about any of Powell's conduct. Arnold, 23 S.E.2d at 738. Therefore, the magistrate judge correctly rejected Floyd's attempt to apply the unclean hands doctrine.

Finally, Floyd complains that the magistrate judge erred in awarding Powell her attorney's fees. Floyd's principal contention is that Powell was not entitled to her fees because she was the only person who benefitted from her suit. Therefore, he argues, her suit more closely resembles an individual, rather than a derivative, action.

Generally, South Carolina does not permit a party to recover his attorney's fees absent a contractual or statutory mandate. See Weeks v. McMillan, 353 S.E.2d 289, 292-93 (S.C. App. 1987). However, a shareholder who brings a derivative suit may recover her attorney's fees. See, e.g., S.C. CODE ANN. § 33-7-400, Official Cmt. 1(i) (Law. Co-op. 1990). Those recoveries may be based, as here, on an application of the common fund theory. That theory permits such recoveries because the suit benefits all of the shareholders and the individual shareholder maintaining it should not have to bear the costs alone. See Weeks, 353 S.E.2d at 293; Mills v. Electric Auto-Lite Co., 396 U.S. 375, 394 (1970) (explaining the rationale for the common fund theory). South Carolina's courts have applied the common fund doctrine to award attorney's fees in derivative actions. See, e.g., Segall, 236 S.E.2d at 318; Weeks v. McMillan, 353 S.E.2d 289, 293 (S.C. App. 1987) (noting that the Segall court appeared to apply the common fund theory).

While Floyd correctly notes that he and Powell are the only remaining shareholders in the corporations, we have not found -- nor have the parties pointed to any -- authority suggesting that South Carolina's courts would not award attorney's fees where only a very small number of shareholders would benefit from the derivative action. Moreover, focusing only on the small number of shareholders neglects the benefits of derivative suits. For example, the accounting brought about by the instant suit will help the corporations run much more efficiently. The records of both companies were in disarray, and many votes on important matters were not even recorded. No shareholders' meetings had been held for years. Floyd was engaged in self-

11

dealing on a grand scale. Even if Floyd were not ordered to purchase Powell's shares, the exposure and correction of those problems greatly benefit both corporations. Those benefits not only increase the value of Powell's shares, but also the value of Floyd's shares.

Finally, we reject Floyd's contention that the magistrate judge's decision was based solely on his misconduct rather than on the common fund theory. Floyd correctly points out that under South Carolina law, a losing party's misconduct is insufficient in itself to provide a basis for an attorney's fee award. See Weeks, 353 S.E.2d at 292-93. However, that was not the basis of the award here. To be sure, the magistrate judge specifically cited Floyd's wrongful behavior as making the suit necessary. However, the court expressly found Powell's suit to be a "fund creating action," see J.A. at 514, and in any event, shareholder suits generally involve allegations of misconduct by corporate officers. Therefore, we find that the magistrate judge did not err in awarding Powell her attorney's fees.

III.

Powell also raises several points on appeal, but we find it necessary to discuss only two. In the Order dated January 21, 1998, the magistrate judge found that neither the $241,000 in attorney's fees and costs awarded to the plaintiff, nor the $137,161 in past director's fees awarded to the plaintiff, should be deducted from the derivative award before taxes are calculated. We affirm that portion of the ruling which excludes the attorney's fees related to the buyout and the director's fees from a pretax deduction from the derivative award. We reverse, however, that portion of the ruling which excludes the attorney's fees related to the derivative action from a pretax deduction.

Powell contends that the magistrate judge should have calculated the attorney's fees as a pretax deduction pursuant to 26 U.S.C. § 162(a) (1994). Section 162 permits deductions of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Id. Floyd supported the pretax deduction below, but argues that Powell is estopped from raising the issue now because she opposed the deduction below.

Powell is not estopped. The doctrine of estoppel applies only to matters of fact. See Folio v. City of Clarksburg , 134 F.3d 1211, 1217-

12

18 (4th Cir. 1998). The question of whether it is proper to deduct the costs and attorney's fees before the taxes are calculated is a legal question, as Floyd admits. <u>See</u> Appellant's Br. at 14. Moreover, the record shows that Powell did support the deduction of the attorney's fees prior to calculating the taxes. She took that position as an alternative to her primary position that Floyd himself should be responsible for paying the taxes, not Gordon Farms. Because she supported the pre-calculation deduction below, the doctrine of estoppel does not apply.

Although Powell is not estopped from raising this issue, the conclusion she reaches is not entirely correct. We find that only a portion of the fees should be deducted from the derivative recovery.

Powell urges us to permit the deduction based in part on <u>Graham v. Commissioner</u>, 326 F.2d 878, 879-80 (4th Cir. 1964). In that case, we concluded that the taxpayer's expenditures on the settlement of and the legal expenses resulting from a suit against a member of its board of directors were "ordinary and necessary" expenses within the meaning of 26 U.S.C. § 212. <u>See id.</u> As we noted in that case, the terms "ordinary and necessary" have the same meaning in § 162 as they do in § 212.**14** <u>See id.</u> at 879.

Other circuits have allowed such deductions under § 162 and § 212 as well. For example, in <u>Larchfield v. United States</u>, 373 F.2d 159, 166 (2d Cir. 1966), the Second Circuit permitted a corporation, pursuant to § 162, to deduct the attorney's fees and expenses it paid to a complaining shareholder in a derivative suit. <u>See id.</u> Likewise, the Third Circuit permitted the deduction of attorney's fees and costs by a corporate shareholder who brought a derivative suit to recover from the directors the misappropriated assets of the company it partly

_____

**14** Indeed, we noted that the two sections were very similar, with the principal difference being that § 162 requires that the expenditure be made in the course of "carrying on a trade or business." 326 F.2d at 879. Here, however, there is no debate that the attorney's fees are directly related to Powell's business. The only debate is whether the expenditures are "ordinary and necessary." Thus, cases interpreting the "ordinary and necessary" language in § 212 are helpful here.

owned. See Newark Morning Ledger Co. v. United States, 539 F.2d 929, 933-34 (3d Cir. 1976).

A recurring theme in the courts' permission of these deductions is that the complaining shareholders sought the recovery of corporate assets and the reversal of fraudulent transactions by corporate officers rather than the disposition of capital assets. In finding that the expenditures were "ordinary and necessary," we said in Graham that the suit arose from the taxpayer's attempt to influence the policies of his corporation. See id. at 880. The Second Circuit specifically noted that Larchfield did not bring the suit to perfect or defend title in property. See Larchfield, 373 F.2d at 167. The Third Circuit, in looking to the origin of the claim, stated that the shareholder simply sought to prevent the destruction of corporate assets rather than to gain a benefit, and specifically noted that neither the price paid for the stock, the value received for the stock, nor a planned disposition of corporate assets was at issue in the case. See Newark Morning Ledger Co., 539 F.2d at 934.

Based on the foregoing authority, we conclude that in the instant case a deduction should be allowed for legal expenses related to the derivative action. We therefore reverse the magistrate's ruling that instructs otherwise.

The expenses related to the buyout, however, are not deductible. Unlike the derivative suit, the buyout award does not effect the recovery of corporate assets fraudulently diverted nor does it rein in some usurpation of corporate power. Rather, it is a transaction that involves the disposition of a capital asset -- Powell's stock.

Arguments that the buyout request arose from the misconduct are not persuasive, either. Certainly, Powell could have brought a derivative suit without requesting a buyout. Conversely, she could have obtained relief without proving any misconduct on Floyd's part. See, e.g., S.C. CODE ANN.§ 33-14-300(2)(i) (Law. Co-op. 1990) (stating that corporate dissolution is available if corporate management is deadlocked and irreparable injury to the corporations will result if there is no relief); Hendley v. Lee, 676 F. Supp. 1317, 1324-25 (D.S.C. 1987)(ordering the buyout of a shareholder in a close corporation where no misconduct was even alleged). In a case also involv-

14

ing misconduct by a corporate officer, the Sixth Circuit disallowed the deduction of the taxpayer's attorney's fees incurred while analyzing her brother's offer to purchase her interest in their jointly owned close corporation. See Brown v. United States , 526 F.2d 135, 137-39 (6th Cir. 1975). We find that persuasive here. Therefore, the expenses related to the buyout are not deductible from the derivative recovery. We therefore affirm the magistrate judge's ruling to that effect.

The magistrate judge also did not err in refusing to deduct the director's fees from the derivative award. Under section 162(a)(1), an individual or corporation may deduct "a reasonable allowance for salaries and other compensation for personal services actually rendered" as an ordinary and necessary business expense. See 26 U.S.C. § 162(a)(1). The parties do not dispute that the director's fees due Powell are reasonable or that they are compensation for services she actually performed (i.e., in her role as director). Thus, upon paying the fees, Gordon Farms is entitled to deduct them as an "ordinary and necessary" business expense.

However, the fact that Gordon Farms may lawfully deduct the fees does not require the conclusion that it must deduct them from the derivative award as a matter of law. Deductions under the tax code are from the taxpayer's gross income. See 26 U.S.C. § 63; 26 U.S.C. § 161. Gross income is more expansive than any one specific source of income (e.g., the derivative award); it includes "all income from whatever source derived." 26 U.S.C. § 61. **15** Thus, the director's fees need not be deducted from any one source of funds, but are deducted from the taxpayer's (Gordon Farms') overall income.

Moreover, the deduction for director's fees from the specific source of funds at issue here (the derivative award) makes even less sense. The director's fees do not represent any part of the derivative recovery -- i.e., the money wrongfully taken from Gordon Farms and Mullikan Vault. Rather, Gordon Farms owes the fees to Powell pursuant to the board's separate, longstanding agreement. Thus, the director's fees are irrelevant to the final amount of the derivative award due the

---

**15** Despite the broad definition of "gross income," the tax code specifically excludes several types of revenue. See, e.g., 26 U.S.C. § 101 (certain death benefits); 26 U.S.C. § 102 (gifts and inheritances).

15

corporation. As a result, the magistrate judge did not err in refusing to permit the deduction of the director's fees from the derivative award.

Having reviewed the record, we find that the magistrate court did not err in ruling as it did in all other challenged matters. Therefore, those decisions are affirmed.

<u>AFFIRMED IN PART AND REVERSED IN PART</u>

16